No. 22-55144 and 22-55406

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TIMOTHY RYAN, M.D.,
Plaintiff-Appellee,

v.

BRANT PUTNAM, M.D., et al.,
Defendants-Appellants.

and

ANISH MAHAJAN, M.D., et al.,
Defendants.

AND RELATED APPEAL

On Appeal from the United States District Court
for the Central District of California
Case No. 2:17-cv-05752-CAS-RAO, Honorable Christina A. Snyder
Judge Presiding

**APPELLEE'S CONSOLIDATED ANSWERING BRIEF**

THOMAS M. BROWN
KENNETH P. WHITE
BROWN WHITE & OSBORN LLP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071
Attorneys for Plaintiff-Appellee

## **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................... 1

II.    STATEMENT OF JURISDICTION ....................................... 2

III.   STATEMENT OF ISSUES ....................................................3

IV.   STATEMENT OF THE CASE ...............................................3

V.    FACTS AND PROCEDURAL HISTORY ...................................4

     A.    Dr. Ryan, A Public Employee, Reported Official Misconduct To Outside Law Enforcement Agencies ................................4

     B.    Dr. White Filed His First Retaliatory Complaint Against Dr. Ryan, Which The MEC Finds is Unfounded .......................................8

     C.    Dr. White Filed A Retaliatory Complaint With the PSA, And The MEC Responds With A Retaliatory Investigation of Dr. Ryan..........................................................................9

     D.    The MEC Directed A "Focused Professional Performance Evaluation" of Dr. Ryan.....................................................10

     E.    The PSA Demanded That Dr. Ryan Accept A "Behavioral Contract" Based On False Allegations...................................13

     F.    Dr. Putnam Threatened To Suspend Dr. Ryan...................16

     G.    The Consequences of the MEC Investigation To Dr. Ryan's Career ..............................................................................16

     H.    Dr. Ryan's Lawsuit And The First Appeal .......................17

     I.    The Summary Judgment Motions ....................................18

     J.    This Appeal .....................................................................21

VI.   SUMMARY OF ARGUMENT.................................................21

VII.  ARGUMENT........................................................................23

# **TABLE OF CONTENTS**

Page

A.   STANDARD OF REVIEW ................................................................23

B.   WHEN A DEFENDANT CLAIMS QUALIFIED IMMUNITY
     IN A SUMMARY JUDGMENT MOTION, THE COURT
     RESOLVES ALL FACTUAL DISPUTES IN THE
     PLAINTIFF'S FAVOR AND VIEWS EVIDENCE IN THE
     LIGHT MOST FAVORABLE TO PLAINTIFF ................................24

C.   A RIGHT IS "CLEARLY ESTABLISHED" EVEN WHEN
     NO PRIOR CASE PROHIBITS THE DEFENDANT'S
     PRECISE CONDUCT ........................................................................25

D.   APPELLANTS SUBJECTED DR. RYAN TO ADVERSE
     EMPLOYMENT ACTIONS UNDER CLEARLY
     ESTABLISHED LAW ........................................................................27

     1.   Dr. Putnam Subjected Dr. Ryan To An Adverse
          Employment Action ..................................................................30

     2.   Dr. Vintch Subjected Dr. Ryan To An Adverse
          Employment Action ..................................................................32

     3.   Dr. Lewis Subjected Dr. Ryan To An Adverse
          Employment Action ..................................................................33

     4.   Dr. de Virgilio Subjected Dr. Ryan To An Adverse
          Employment Action ..................................................................33

E.   CLEARLY ESTABLISHED LAW DEMONSTRATES DR.
     RYAN SPOKE AS A PRIVATE CITIZEN .......................................35

F.   APPELLANTS ATTEMPT TO DISGUISE AN ATTACK ON
     THE DISTRICT COURT'S FINDINGS ABOUT THE
     SUFFICIENCY OF THE EVIDENCE AS A LEGAL
     ARGUMENT .....................................................................................37

     1.   Appellants Argument Is An Attack On The District
          Court's Findings On Sufficiency Of The Evidence .................37

# **TABLE OF CONTENTS**

Page

2.  Appellants' Argument Is Also Wrong; It Is Clearly
    Established That Their Proffered Justification Is
    Inadequate .................................................................................42

G.  APPELLANTS VIOLATED DR. RYAN'S FIRST
    AMENDMENT RIGHTS .................................................................43

VIII. CONCLUSION................................................................................44

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Creighton*,
 483 U.S. 635 (1987) .............................................................26

*Bollinger v. Oregon*,
 172 F. App'x 770 (9th Cir. 2006) ................................... 29, 30

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,
 149 F.3d 971 (9th Cir. 1998).................................................40

*Coszalter v. City of Salem*,
 320 F.3d 968 (9th Cir. 2003).................................... 17, 28, 30

*Ellins v. City of Sierra Madre*,
 710 F.3d 1049 (9th Cir. 2013)................................... 25, 27, 39

*Eng v. Cooley*,
 552 F.3d 1062 (9th Cir. 2009).................................... 35, 40

*Est. of Anderson v. Marsh*,
 985 F.3d 726 (9th Cir. 2021) ....................................... passim

*Hope v. Pelzer*,
 536 U.S. 730 (2002) .............................................................26

*Johnson v. Jones*,
 515 U.S. 304 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ...................... 24, 42

*Keates v. Koile*,
 883 F.3d 1228 (9th Cir. 2018)...............................................31

*Larez v. City of Los Angeles*,
 946 F.2d 630 (9th Cir.1991)..................................................32

*Mueller v. Auker*,
 57 F.3d 979 (9th Cir. 2009)...................................................25

*Navarro v. Block*,
 250 F.3d 729 (9th Cir. 2001).................................................32

# TABLE OF AUTHORITIES

Page(s)

*Posey v. Lake Pend Oreille Sch. Dist. No. 84*,
  546 F.3d 1121 (9th Cir. 2008) .................................................................35

*Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*,
  479 F.3d 1175 (9th Cir. 2007) .................................................................31

*Rivero v. City & Cnty of S.F.*,
  316 F.3d 857 (9th Cir. 2002) ...................................................................43

*Robinson v. York*,
  566 F.3d 817 (9th Cir. 2009) .................................................... 27, 35, 42

*Rodriguez v. Cnty. of Los Angeles*,
  891 F.3d 776 (9th Cir. 2018) ...................................................................31

*Ryan v. Putnam*,
  777 F.App'x 245 (9th Cir. 2019) ........................................................ 3, 17

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .................................................................31

*Tolan v. Cotton*
  (2014) 572 U.S. 650 .................................................................................25

*Ulrich v. City & Cty. of San Francisco*,
  308 F.3d 968 (9th Cir. 2002) .................................................... 18, 28, 29

*Watkins v. City of Oakland, Cal.*,
  145 F.3d 1087 (9th Cir. 1998) .................................................................32

**Statutes**

28 U.S.C. § 1291 .......................................................................................2

28 U.S.C. § 1331 .......................................................................................2

28 U.S.C. § 1983 ............................................................................ 2, 3, 17

# I.    INTRODUCTION

Appellant Dr. Timothy Ryan ("Dr. Ryan") has been struggling for almost six years to vindicate his First Amendment rights in the face of Appellants' specious claims of qualified immunity.  Dr. Ryan – whom Appellants wrongfully investigated and disciplined for reporting misconduct to outside authorities – brought this Section 1983 action for First Amendment retaliation in 2017.  First, Appellants moved to dismiss on the grounds of qualified immunity.  This Court reversed the District Court's faulty ruling granting that motion.  Now, Appellants have further delayed justice with this interlocutory appeal of the District Court's denial of their motions for summary judgment on the grounds of qualified immunity.

This Court has made the limited scope of such an appeal very clear:  it will consider application of law to undisputed facts, but it lacks jurisdiction to consider challenges to the District Court's analysis of which facts are genuinely disputed. *Est. of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021).  Appellants pay lip service to the rule but spend most of their brief defying it.  For instance, Appellants argue that it was not clearly established that their justifications for their actions were inadequate, pointedly ignoring the District Court's finding that there was a genuine dispute of material fact over whether those justifications were merely pretextual.  Appellants also argue that it was not clearly established that Dr. Ryan

was acting as a private citizen, not in his capacity as employee, when he blew the

whistle. Once again, Appellants ignore the District Court's findings about triable

issues of fact, and misstate the record in the bargain.

Appellants – mindful that this Court has already ruled in this case that it was

clearly established that their initiating an investigation of Dr. Ryan could be an

adverse employment action – argue that it was not clearly established that they

could be held liable for doing so *by voting*. An unsympathetic wall of Ninth

Circuit precedent refutes them; it's clearly established that they can be liable for

directing, ratifying, approving, or acquiescing in unconstitutional actions.

This appeal is utterly without merit and the Court should affirm as to the the

limited arguments over which it has jurisdiction.

## II.    STATEMENT OF JURISDICTION

This is an interlocutory appeal from two orders denying motions for

summary judgment premised, in part, on assertions of qualified immunity. The

District Court had jurisdiction over Dr. Ryan's claim under 28 U.S.C. § 1983

pursuant to 28 U.S.C. § 1331. Appellants filed timely notices of appeal from the

District Court's orders. ER 5:978-99; 2:79. This Court has jurisdiction under 28

U.S.C. § 1291. However, that jurisdiction is limited to resolving Appellants'

"purely legal contention" that conduct did not violate Dr. Ryan's constitutional

rights or did not violate clearly established law, and does not include review of disputes over the sufficiency of evidence. *Est. of Anderson*, 985 F.3d at 730.

## III. STATEMENT OF ISSUES

Whether the District Court erred in determining that, given the facts the District Court found to be disputed, and taken in the light most favorable to Dr. Ryan and establishing all factual disputes in his favor, the facts that Appellants violated Dr. Ryan's First Amendment rights under clearly established law.

## IV. STATEMENT OF THE CASE

Dr. Ryan filed this case against Defendants and Appellants Brant Putnam, M.D., Janine Vintch, M.D., Christian de Virgilio, M.D. and others on August 3, 2017 for Retaliation Based on Exercise of First Amendment Rights under 42 U.S.C. § 1983. ER 9:2071-83. Dr. Ryan amended his Complaint as a matter of right and filed his First Amended Complaint ("FAC") on October 6, 2017, adding Defendant and Appellant Roger Lewis, M.D. and others (Drs. Putnam, Vintch, de Virgilio, and Lewis are collectively, "Defendants" and "Appellants"). ER 9:2087-88. On February 15, 2018, Judge Manuel L. Real granted Appellants' motion to dismiss. Dr. Ryan appealed. On September 18, 2019, this Court reversed and remanded. *Ryan v. Putnam*, 777 F.App'x 245, 246 (9th Cir. 2019).

Drs. Putnam and Vintch filed a motion for summary judgment on October 29, 2021, on grounds including qualified immunity. ER 9:2018. Dr. Ryan filed

opposition papers on November 15, 2021. ER 7:142. Drs. Putnam and Vintch filed reply papers on November 22, 2021, and at the District Court's request, the parties filed supplemental briefs on the issue of qualified immunity. ER 5:991, 5:980-990. The District Court denied the motion for summary judgment in a written order on January 10, 2022. ER 1:40-76.

Drs. de Virgilio and Lewis, and others not party to this appeal, filed a motion for summary judgment based in part on qualified immunity on February 4, 2022. ER 5:931. Dr. Ryan filed his opposition papers on February 22, 2022, and Drs. de Virgilio and Lewis filed their replies on March 7, 2022. ER 3:431, 2:090. The District Court issued a written order denying the motion as to Drs. de Virgilio and Lewis on March 22, 2022. ER 1:2-39.

## V. FACTS AND PROCEDURAL HISTORY

The record shows the following facts.

## A. Dr. Ryan, A Public Employee, Reported Official Misconduct To Outside Law Enforcement Agencies

Dr. Ryan began working at Harbor-UCLA as a Staff Vascular Surgeon in 2013. ER 7:1345. In 2014, Dr. Ryan became aware of a clinical trial the NIH sponsored called "BEST-CLI." ER 7:1345. The trial required participants to have completed a set number of surgeries to be qualified. ER 7:1345. Dr. Ryan doubted that some Harbor surgeons – including Drs. Rodney White and Carlos

Donayre – had the requisite number of surgeries, and believed they falsified their applications in order to participate. ER 7:1345. On December 4, 2014, Dr. Ryan reported his concerns to senior physicians at Harbor. ER 7:1345. Based on their responses, Dr. Ryan believed they were not seriously investigating. ER 7:1345. Dr. Ryan was concerned because he believed that public employees had falsified an application to a clinical trial, were not qualified to participate in the trial, their lack of qualifications would impact the reliability of the trial, and patients would be put at risk. ER 7:1345-46. On December 4, 2014, Dr. Ryan contacted the NIH and reported his concerns. ER 7:1345-46.

In response to Dr. Ryan's report to the NIH, the BEST-CLI trial management conducted an audit and found that "several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent endovascular operator." ER 7:1396, 8:1623-24. The investigation further found that the surgeons at Harbor, including Drs. White and Donayre, were not qualified to conduct endovascular surgeries in the trial and could not enroll more patients. ER 8:1623-24, 6:1141. Defendants Drs. Putnam and Vintch were aware of this development.

In December 2013, Dr. Ryan treated patient "BH" for an aortic dissection through medication, which he believed to be the correct course. ER 7:1346. Shortly thereafter, Dr. White's nurse Rowena Buwalda copied Dr. Ryan on an

email reporting that she had instructed BH to come to the hospital the following day and to complain of chest pains when she did so. ER 7:1346. Dr. Ryan discovered that Dr. White had re-admitted BH to Harbor under the false pretense of her having chest pains to make her admission appear to be an emergency, guaranteeing insurance payment. ER 7:1346. Dr. Ryan also learned that Dr. Donayre had performed surgery on BH, implanting a stent graft Medtronic manufactured ER 7:1346, and that BH suffered a serious aortic injury from the stent graft surgery, resulting in a major stroke. ER 7:1346.

Dr. Ryan learned that Medtronic was paying Harbor physicians thousands per Medtronic stent implant surgery under the ruse of their teaching a "course" on how to perform the implant, even though no other physicians were present for these supposed "courses." ER 7:1346-47. The physicians were making thousands of dollars per surgery and Medtronic was being paid tens of thousands of dollars for the stents. ER 7:1346-47. Dr. Ryan believed this represented doctors getting kickbacks from a device manufacturer to use their product, compromised medical judgment, and it threatened the health and safety of patients for whom the stent grafts were not indicated, as in the case of BH. ER 7:1346-47. Dr. Ryan confronted Dr. Donayre about this, and Dr. Donayre admitted that Medtronic paid him and Dr. White for these "courses," and Dr. Ryan had to learn to live with it. ER 7:1347.

Dr. Ryan first reported his concerns to superiors in January 2014. ER 7:1347. Dr. Ryan approached Dr. Bruce Stabile, Chief of Surgery, who told Dr. Ryan that he should find a way to "restore harmony in the vascular division by finding a way to share fees" with Dr. White. ER 7:1347. This response was shocking and unacceptable to Dr. Ryan, so he went to Dr. Van Natta and repeated his concerns to him. ER 7:1347. Dr. Van Natta told Dr. Ryan he should "keep [his] head down" during his six-month probationary period. ER 7:1347. In Fall 2014, Dr. Ryan expressed his concerns to Dr. Putnam. ER 7:1347.

Dr. Ryan knew that Harbor-UCLA's Medical Executive Committee ("MEC") conducted a Focused Professional Performance Evaluation ("FPPE") of Doctor White in 2014 in response to Dr. Ryan's complaint because the FPPE team interviewed Dr. Ryan. ER 7:1347. Dr. Ryan told that team – which included Dr. DeVirgilio – about his concerns and conclusions about Dr. White and the Medtronic kickbacks. ER 7:1347. But when Dr. Ryan saw Harbor taking no action about his complaint through the FPPE, he reported to outside criminal authorities. ER 7:1348.

Dr. Ryan first reported to a Deputy District Attorney ("DDA") on January 12, 2015, describing his concerns that Harbor physicians were getting kickbacks for implanting devices that were not medically indicated. ER 7:1348. The DDA told Dr. Ryan that the DA's would investigate, and later interviewed Dr. Ryan. ER

7:1348. Shortly after his call with the DDA, Dr. Ryan told Dr. De Virgilio that he reported to the DA's Office who would investigate. ER 7:1348. In the Summer 2015, shortly after Dr. Ryan's report to the DA's Office, Medtronic "courses" at Harbor ceased. ER 7:1348.

## B. Dr. White Filed His First Retaliatory Complaint Against Dr. Ryan, Which The MEC Deemed Unfounded

On January 26, 2015, shortly after NIH's audit of the BEST-CLI trial, Dr. White submitted an email to Harbor leadership "to report invasion of personal privacy, and potential federal (HIPPA) and state (California Medical Privacy Act) patient privacy violations by Dr. Timothy Ryan." ER 6:1174. On February 4, 2015, Dr. White submitted a package of information in support of his complaint. ER 6:1175-80. Dr. White's February 4, 2015 affidavit complained Dr. Ryan had improperly reviewed medical records and approached Harbor personnel to collect information regarding Dr. White and his patients. ER 6:1178. This was a reference to information Dr. Ryan gathered for his report to the NIH and the DA's Office. ER 7:1348. Dr. White included a report of surgeries that Dr. Ryan supposedly asked an assistant to provide. ER 6:1180. In fact, the report showed it was created on January 30, 2015, *after* Dr. Ryan investigated, after the NIH's audit, and after Dr. White's complaint. ER 7:1348-49, 6:1180. In other words, it was fabricated.

8

The MEC, of which Drs. Putnam, Vintch, and Lewis were members, investigated Dr. White's complaint before September 2015. ER 6:1317-23. The MEC knew Dr. White was complaining Dr. Ryan had gathered patient information to send it to the NIH, and that the NIH had determined that Dr. White had falsified his experience to participate in the study. ER *Id.* The MEC referred the issue to Harbor's HIPAA Compliance Officer, who found no HIPAA violation. ER *Id.* Having "spent months and worked very diligently" on the investigation and believed it had "investigated adequately," the MEC took no action against Dr. Ryan. ER *Id.*

## C. Dr. White Filed A Retaliatory Complaint With The PSA, And The MEC Responds With A Retaliatory Investigation Of Dr. Ryan

Dr. White was not satisfied. On August 24, 2015, Dr. White sent Dr. Putnam a Request for Corrective Action demanding that Harbor-UCLA's Professional Staff Association ("PSA") take action against Dr. Ryan (ER 6:1183-85) for allegedly violating HIPAA, the Confidentiality of Medical Information Act, and Dr. White's privacy by asking for and reviewing medical records. ER *Id.* Once again, Dr. White was describing Dr. Ryan's actions asking for and reviewing medical records to make a report to the NIH and DA's Office. ER 7:1348. Dr. Putnam circulated Dr. White's request to Drs. Vintch and Dan Castro. ER 6:1183. Dr. Castro counseled Drs. Putnam and Vintch that "this particular

complaint seems steeped in historical interactions that may never be fully understood." ER 6:1187.

Nevertheless, on September 28, 2015, Dr. Putnam presided over a MEC meeting with Dr. Vintch present to discuss Dr. White's request. At this time, Dr. Putnam, the person leading the meeting, would generally draft the minutes. ER 7:1370-71, 7:1394-95. The minutes of the September 28, 2015 meeting show that the MEC acknowledged that the MEC had previously adequately considered and rejected Dr. White's claims and that revisiting them could be seen as retaliatory. ER 6:1319-20. Nevertheless, the MEC decided to reopen its investigation reach out to Harbor's HIPAA compliance officer "to get more details." ER 6:1319-20.[1]

## D. The MEC Directed A "Focused Professional Performance Evaluation" Of Dr. Ryan

In November 2015, Dr. White submitted an "Addendum" to his Request for Corrective Action, complaining that Dr. Ryan filed a complaint against him with

---

[1] More than a year after the September 28, 2015 meeting, Dr. Putnam sent Dr. Vintch a package of all MEC minutes concerning Dr. Ryan and asked her to "look them over." ER 6:1204. In this package, the minutes of the September 28, 2015 MEC meeting were substantially altered. They were shorter, removed the references to Dr. Ryan's claims against Dr. White, removed the admission that Dr. White's complaints were based on Dr. Ryan's investigations of the BEST-CLI trial, and omitted the statement that taking further action could be seen as retaliation because the MEC felt it had already investigated adequately. ER 6:1242-43. Dr. Putnam sent this version of the minutes to the MSO to act as the official minutes of the MEC meeting, and said he would come sign them. ER 6:1249. The clear inference is that Dr. Putnam falsified the minutes to hide the MEC's retaliatory intent.

the County.  ER 8:1812.  Dr. Putnam did not understand Dr. White's Addendum to refer to any specific behavior by Dr. Ryan other than filing a complaint with the County.  ER 7:1368-69.  Nevertheless, Dr. Putnam presided over a MEC meeting on December 28, 2015 to discuss the Addendum, and MEC recommended that Dr. de Virgilio, the Chair of Surgery, form an Ad Hoc Committee to conduct a FPPE of Dr. Ryan.  ER 6:1217-20.  Dr. Putnam immediately wrote to Dr. White to inform him that MEC formed a committee to conduct an FPPE on Dr. Ryan.  ER 6:1173.  Dr. White openly complained to Harbor leaders that Dr. Ryan had violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH."  ER 6:1336.

The resulting FPPE report accused Dr. Ryan of accessing and requesting medical records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged that was the case.  ER 6:1319-23, 8:1539-41.  The FPPE asserted that Dr. White and Dr. Donayre were leaving Harbor because of Dr. Ryan, but did not discuss or disclose that Dr. Ryan's report to the NIH had resulted in Dr. White and Dr. Donayre being disqualified for participation in endovascular procedures in the BEST-CLI trial and had led to Medtronic no longer paying for them to give "courses" surrounding use of Medtronic stent grafts. ER 8:1541, 81623-24, 6:1144.

The FPPE also accused Dr. Ryan of yelling and other "unprofessional behavior" towards medical staff.  ER 8:1541.  Those accusations were not true. ER 7:1349.  More importantly, the PSA did not address the allegations consistently with its rules and normal practices. The PSA's bylaws encourage physician discipline through "progressive steps" beginning with "collegial and educational efforts."  ER 8:1688.  When other physicians have been accused of raising their voices in the operating room, Dr. Putnam managed it by counseling them before resorting to an FPPE.  ER 7:1365-66.  Indeed, Dr. Putnam's "first approach" to a physician accused of unprofessional behavior is to get the physician's supervisor involved and pursue appropriate counseling before getting the PSA involved.  ER 7:1365-67.  Neither Dr. Putnam nor Dr. Ryan's supervisor, Dr. de Virgilio, were aware of any counseling of Dr. Ryan before the FPPE.  ER 7:1367, 7:1424-25. That is because there were no such efforts.  Nobody counseled Dr. Ryan about any of Dr. White's complaints described in the FPPE.  ER 7:1349.  Moreover, Dr. Ryan had observed other doctors yelling and swearing at nurses and doctors without being disciplined.  ER 7:1349.  Drs. Putnam and Donayre have yelled in the operating room and not been disciplined.  ER 7:1349, 7:1367.

The FPPE also included witness statements that Defendants and MEC knew to be untrue, and that expressed anger at Dr. Ryan's report to the NIH and District Attorney.  The statements quoted Dr. White as saying that he was "cleared of

allegations" by the NIH report, though as the MEC know, the investigators found that Dr. White and others had falsified their qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial. ER 8:1800, 8:1623-24. The statements quoted Dr. de Virgilio as saying that the NIH found Dr. Ryan's complaint and determined it was unfounded, untrue for the same reasons. ER 6:1193-94. The witness statements quoted Dr. De Virgilio as saying, "DHS is auditing income of Dr. White's research team because of Dr. Ryan's complaints." ER *Id.* The statements quoted Dr. Donayre as complaining about Dr. Ryan's report to the NIH and saying the NIH audit "cleared" him and Dr. Donayre, which was untrue. ER 6:1200-01, 8:1235-36. The statements quoted Dr. Donayre as saying that as a result of Dr. Ryan's report to the NIH, "Dr. Donayre felt the need to constantly look over his shoulders all the time because of Dr. Ryan. For this reason, Dr. Donayre decided to leave Harbor-UCLA." ER 6:1201.

## E. The PSA Demanded That Dr. Ryan Accept A "Behavioral Contract" Based On False Allegations

On April 25, 2016, Dr. Putnam presided over an MEC meeting. ER 6:1294. The original minutes of that meeting, which Dr. Putnam signed and dated in May 2015, included damning admissions by the MEC ER 6:1294-96: "A meeting with Dr. Hal Yee was held to discuss any action that might be taken against Dr. Ryan that might compromise the County. Any action that we take will be separate from

13

any action taken by LA County." "The fear was that any action we take might comprise [sic] what the county is doing or might create a medical-legal action against us. Dr. Yee suggested we proceed with caution because there was concern about whistleblowing as there were two parts of the lawsuit." The minutes also cited Harbor's HIPAA Privacy Officer, who reported that County Counsel's initial findings on January 19, 2016 were that "Dr. Ryan did not receive APHI [Protected Health Information] based on a document they have," and "when the clerk was asked for the actual form that was submitted, she could not produce it. She stated that when Dr. Ryan made the request, she did not question him because he was a person of authority," and "we have a policy in place that needs to be completed and we are obligated to report Dr. Ryan to the state." ER 6:1294-96.

Dr. Putnam removed these harmful admissions from the altered version of the minutes that Dr. Putnam circulated to Dr. Vintch in December 2016 and then submitted to the MSO as the official record of the meeting. ER 6:1270-73. He removed references to "compromising" the County and Dr. Yee's caution about whistleblowing, a substantial narrative about the FPPE was inserted, the discussion of Mr. Valentin's report was altered to assert that Dr. Ryan had requested protected health information inappropriately, and deleted the reference to the clerk not being able to produce the key document. ER 6:1270-73. Once again, Drs. Putnam and

Vintch could not explain why there were different versions of the minutes. ER 7:1402-04.

On July 25, 2016, the MEC voted to develop a Behavioral Contract for Dr. Ryan and revoke his privileges at Harbor if he did not agree to it. ER 6:1263-66. The proposed contract required Dr. Ryan to admit to wrongdoing he had not committed. ER 7:1350. The contract included a term requiring Dr. Ryan to make complaints about other physicians only within Harbor channels (ER 8:1548) and a waiver of claims against everyone involved in the Agreement. ER 8:1550. Drs. Vintch and Putnam were not aware of any other Behavioral Agreement requiring a waiver of claims. ER 7:1380-81, 1405-07. Moreover, another doctor given a Behavioral Agreement for "unprofessional, intimidating, disruptive" behavior did not include any such waiver. ER 6:1331-35.

The MEC, including Drs. Putnam and Vintch, did not expect Dr. Ryan to accept the proposed Behavioral Contract. ER 6:1246. Dr. Ryan told Dr. De Virgilio that the proposed Behavioral Contract was unacceptable because it required him to admit to things he did not do and restricted him from reporting misconduct outside Harbor and forced him to waive claims. ER 6:1342, 7:1350. Dr. Putnam and the MEC refused to make any changes to the proposed Behavioral Agreement. ER 6:1342, 7:1350.

**F.     Dr. Putnam Threatened To Suspend Dr. Ryan**

On October 5, 2016, Dr. Putnam sent Dr. Ryan a Notice of Proposed

Adverse Action and Hearing Rights informing him of the intent to suspend his

privileges because he refused to sign the Behavioral Agreement.  ER 8:1813.  On

November 10, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Charges" outlining the

PSA's accusations against him.  ER 8:1817.  That Notice listed "Openly

threatening to call external agencies to conduct investigations" and "Openly

making unfounded accusations in an angry manner" as some of Dr. Ryan's

violations.  ER 8:1819.  It did not mention HIPAA violations.  ER 8:1819.  It was

in December 2016, immediately after that Notice, that Dr. Putnam circulated the

altered MEC minutes to Dr. Vintch for her comment.  ER 6:1204.  On February 27,

2017, Dr. Putnam sent Dr. Ryan a First Amended Notice of Charges setting forth

the PSA's accusations against him.  ER 8:1824.  The Amended Notice *deleted* the

allegations that Dr. Ryan "Openly threaten[ed] to call external agencies to conduct

investigations" and "Openly ma[de] unfounded accusations in an angry manner",

leaving an empty bullet point where those allegations had been.  ER 8:1827.  The

Amended Notice still did not mention HIPAA.  ER 8:1827.

**G.     The Consequences Of The MEC Investigation To Dr. Ryan's Career**

Dr. Ryan has been unable to obtain a job interview for a surgeon position, let

alone a job, because he must disclose in job applications the MEC's investigation

and effort to suspend his privileges.  ER 7:1350.

## H.     Dr. Ryan's Lawsuit And The First Appeal

Dr. Ryan sued defendants including Appellants Drs. Putnam, Vintch, and de Virgilio on August 3, 2017 for Retaliation Based on Exercise of First Amendment Rights under 42 U.S.C. § 1983.  ER 9:2071-83.  Dr. Ryan amended his Complaint as a matter of right and filed his First Amended Complaint on October 6, 2017, adding Appellant Dr. Lewis and others.  ER 9:2087-88.  On February 15, 2018, Judge Manuel L. Real granted Appellants' motion to dismiss on the grounds of qualified immunity.  Dr. Ryan appealed.  On September 18, 2019, this Court reversed and remanded.  *Ryan v. Putnam*, 777 F.App'x 245, 246 (9th Cir. 2019). This Court found:

> An adverse employment action is action "reasonably likely to deter [the plaintiff] from engaging in protected activity under the First Amendment."  *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (internal quotation marks and alteration omitted). Since 2002, we have recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the "adverse employment action" requirement.

*Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002).

We find the allegations here sufficiently similar to Ulrich to satisfy the clearly established prong of the qualified immunity analysis at this early stage.

Construing all allegations in Dr. Ryan's favor, he has alleged that the doctors initiated disciplinary proceedings which sought to revoke his staff privileges, voted to revoke those privileges, and served him with a notice of intent to suspend. He has also alleged that these decisions "will permanently impair [his] ability to seek and secure employment" in the future. Accordingly, qualified immunity is not warranted at this stage. *Ryan,* 777 F. App'x at 246.

## I.    <u>The Summary Judgment Motions</u>

After remand, on October 29, 2021, Drs. Putnam and Vintch filed a motion for summary judgment or, in the alternative, summary adjudication. ER 9:2018. They argued, among other things, that Dr. Ryan spoke as a public employee and not a private citizen, that there was no causal nexus between Dr. Ryan's speech and the Defendants' actions, that the Defendants had adequate justification for their actions and that their actions were inevitable, and that they were entitled to qualified immunity because it was not clearly established that they inflicted an

adverse employment action on Dr. Ryan or that their actions were not justified. ER 9:2033-2050.

On January 10, 2022, the District Court denied the Motion. ER 1:40. With respect to whether Dr. Ryan spoke as a private citizen or employee, the District Court found that there was "no evidence that Ryan's external reports were submitted pursuant to his professional duties at Harbor-UCLA." ER 1:60. With respect to Defendants' argument that Dr. Ryan had admitted, in requesting indemnification on Dr. White's lawsuits, that he acted as a Harbor-UCLA doctor, the District Court pointed out that Dr. White's lawsuit did not address Dr. Ryan's reports to external authorities, and that therefore there was at least a triable issue of fact as to whether he spoke as a private citizen. ER 1:60. The District Court also found that genuine disputes of material fact precluded summary judgment on Defendants' defense of justification because Dr. Ryan offered sufficient evidence to create a genuine dispute of fact about whether the proffered justifications were pretextual. ER 1:64-66. With respect to qualified immunity, the District Court found that clearly established Ninth Circuit law held that an investigation that had an impact on employment prospects was a "adverse employment action," and that such precedent also clearly established that Defendants could not reasonably believe that retaliating against Dr. Ryan's reports to outside authorities was permissible. ER 1:74.

Dr. de Virgilio and Dr. Lewis (and other defendants not parties to this appeal) also filed a motion for summary judgment, and argued that: (1) Dr. de Virgilio didn't take any adverse employment action (Dr. Lewis didn't make this argument), (2) retaliatory motive couldn't be imputed to Drs. de Virgilio or Lewis, (3) Drs. de Virgilio and Lewis had adequate justification for their actions and would inevitably have taken the same action, and (4) Drs. de Virglio and Lewis were entitled to qualified immunity because there was no clearly established law showing they had taken an adverse employment action or that their justification for their behavior was inadequate. ER 5:964-972.

The District Court denied the motion as to Dr. de Virgilio and Dr. Lewis. The District Court found that Dr. de Virgilio's participation in the initiation of the FPPE constituted adverse employment action because it was a disciplinary proceeding that threatened to revoke staff privileges, as evidenced by the fact that Dr. Ryan's FPPE indicated that dismissal or removal of staff privileges were an option. ER 1:27. The District Court found that, at a minimum, there was a triable issue of material fact as to whether the FPPE against Dr. Ryan threatened to revoke his clinical privileges. ER 1:27. The District Court found that there were genuine disputes of material fact on the issue of justification because Dr. Ryan presented evidence sufficient to show the proffered justifications could have been pretextual. ER 1:31-33.

As to qualified immunity, the District Court found that under Ninth Circuit law it is clearly established that Dr. Ryan had a First Amendment right to make reports to government entities without retaliation, and that it was clearly established that initiating disciplinary proceedings that threaten to revoke staff privileges and which have negative employment consequences is an adverse employment action. ER 1:35. The District Court found that Ninth Circuit precedent clearly established that an employer could not reasonably believe it was appropriate to retaliate against a public employee for reporting misconduct. ER 1:37.

**J.**   **This Appeal**

Appellants Drs. Putnam, Vintch, de Virgilio, and Lewis now appeal the District Court's denial of the qualified immunity components of their motions for summary judgment. They argue that Appellants did not do anything that was clearly established to be an adverse employment action, that law did not clearly establish that Dr. Ryan was speaking as a private citizen, that law did not clearly establish that their actions were not justified in the balancing of their goals over Dr. Ryan's First Amendment rights, and that they did not violate Dr. Ryan's constitutional rights at all.

## VI.   SUMMARY OF ARGUMENT

Appellants make a handful of arguments, all of them either wrong or outside

the Court's limited jurisdiction on this interlocutory appeal.

Appellants first argue that it was not clearly established that *voting* to initiate an investigation of Dr. Ryan, or leading the MEC's decision to do so, could be an adverse employment action, since no cases talk about voting for adverse employment actions. This is absurd. This Circuit's law clearly establishes that state actors may be held liable for directing, ratifying, and acquiescing in constitutional violations, including through a local voting body.

Appellants next argue that no clearly established law showed that Dr. Ryan's whistleblowing was done as a private citizen rather than in his employment capacity. But the District Court found that there was no evidence that Dr. Ryan's job duties included whistleblowing, and Appellants' assertion that Dr. Ryan admitted whistleblowing was part of his job duties is based on a misstatement of the record.

Appellants argue that there's no clearly established law showing that they were wrong in believing their justifications for acting against Dr. Ryan outweighed his First Amendment interests. But this argument ignores that the District Court found that there's a genuine dispute of material fact about whether those justifications are ***merely pretextual***. Appellants suggest – without saying – that this Court must *presume* their justifications were sincere, and then find precedent showing that they were insufficient, which is not the law. Moreover, even taken at

22

face value, their argument is wrong – this Circuit's authority clearly provides that employers can't justify retaliating against whistleblowers.

Finally Appellants argue that they didn't violate Dr. Ryan's First Amendment rights. But this is merely a repeat of their arguments about adverse employment actions and their justifications, and fails for the same reasons.

The appeal is entirely meritless.

## VII. ARGUMENT

### A. STANDARD OF REVIEW

This Court conducts only a "circumscribed" review of an interlocutory appeal of the denial of motion for summary judgment premised on qualified immunity. *Est. of Anderson*, 985 F.3d at 730. Its "interlocutory review jurisdiction is limited to resolving a defendant's purely legal contention that [his or her] conduct did not violate the [Constitution] and, in any event, did not violate clearly established law." *Id.* at 731 (internal quotations omitted). To the extent the trial court's summary judgment ruling turns on the question of "evidence sufficiency," this Court lacks jurisdiction to hear it. *Ibid.* However, the portion of a summary judgment order "that turns on the application of clearly established law to a given (for appellate purposes undisputed) set of facts is immediately appealable." *Ibid.* As this Court recently explained:

If the defendant argues only that the evidence is insufficient to raise a genuine issue of material fact, we lack jurisdiction. If the defendant's appeal raises purely legal questions, however, such as whether his alleged conduct violated clearly established law, we may review those issues. In other words, we have jurisdiction to review an issue of law determining entitlement to qualified immunity—even if the district court's summary judgment ruling also contains an evidence-sufficiency determination—but not to accede to a defendant's request that we review that evidence-sufficiency determination on appeal. *Ibid.*

In short, a "public official may not immediately appeal 'a fact-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial.'" *Est. of Anderson*, *supra*, 985 F.3d at 731, quoting *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

## B.   WHEN A DEFENDANT CLAIMS QUALIFIED IMMUNITY IN A SUMMARY JUDGMENT MOTION, THE COURT RESOLVES ALL FACTUAL DISPUTES IN THE PLAINTIFF'S FAVOR AND VIEWS EVIDENCE IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

This is an appeal from the trial court's denial of Appellants' motions for

summary judgment based, in part, on an assertion of qualified immunity. Courts reviewing such a motion employ a two-pronged inquiry. First, the court determines whether the facts "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Tolan v. Cotton* (2014) 572 U.S. 650, 655-56 (citations and internal quotations omitted). In doing so, courts "resolve all factual disputes in favor of the party asserting the injury." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) Second, the court asks whether the right in question was "clearly established" at the time of the violation – that is, whether the law at the time provided "fair warning" that the conduct was unconstitutional. *Tolan,* 572 U.S. at 655; *Mueller v. Auker*, 57 F.3d 979, 993 (9th Cir. 2009) (rights are "clearly established" when they are "defined at the appropriate level of specificity" to make them clear to a defendant).

Thus, not only is this Court without jurisdiction to examine the District Court's determination of the sufficiency of the evidence, that determination properly resolved all factual disputes in Dr. Ryan's favor and viewed all evidence in the light most favorable to him.

## C.    A RIGHT IS "CLEARLY ESTABLISHED" EVEN WHEN NO PRIOR CASE PROHIBITS THE DEFENDANT'S PRECISE CONDUCT

In their Opening Brief, Appellants engage in arguments familiar to any qualified immunity practitioner – demanding that Dr. Ryan produce a prior case on

*precisely* the same facts prohibiting their conduct to show that his right was "clearly established." This "no case ever said you can't do this exact thing while wearing one green sock on a rainy Tuesday" analysis is common, but wrong.

The United States Supreme Court has specifically rejected such a "rigid gloss" on the "clearly established" standard. In *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), the Court explained:

> [Q]ualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S., at 206, 121 S.Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell [v. Forsyth*, 472 U.S. 511,] 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.", *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Thus, a right can be "clearly established" even if prior cases are not "fundamentally" or "materially" similar. *Anderson*, 483 U.S. at 741. Rather, "the salient question . . . . is whether the state of the law . . . gave respondents fair

warning that their alleged treatment . . . was unconstitutional." *Ibid.  Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009) ("closely analogous preexisting case law is not required to show that a right was clearly established.").

In *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013), an appeal from an order granting summary judgment on a public employee's First Amendment retaliation claim, this Court rejected any requirement that the plaintiff demonstrate a prior case that is "narrowly" similar.  "The question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional." *Id.* at 1064.

## D.     APPELLANTS SUBJECTED DR. RYAN TO ADVERSE EMPLOYMENT ACTIONS UNDER CLEARLY ESTABLISHED LAW

Dr. Ryan's burden in a Section 1983 action is very familiar.  To prove Appellants retaliated against Plaintiff's protected speech in violation of Section 1983, Dr. Ryan must prove "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action . . . ." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013). The burden then shifts to Appellants to show "(4)

whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Id*. On appeal, Appellants argue that the application of some of these elements was not clearly established when they retaliated against Dr. Ryan.

Appellants first argument on appeal is that none of them subjected Dr. Ryan to anything that was clearly established to be an adverse employment action under the law. They're wrong. To begin, the shadow of this Court's prior argument in *this case* looms over their argument. This Court held:

> An adverse employment action is action "reasonably likely to deter [the plaintiff] from engaging in protected activity under the First Amendment." *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (internal quotation marks and alteration omitted). ***Since 2002, we have recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the "adverse employment action" requirement.*** *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002).

We find the allegations here sufficiently similar to Ulrich to satisfy the clearly established prong of the qualified immunity analysis at this early stage.

Construing all allegations in Dr. Ryan's favor, he has alleged that the doctors initiated disciplinary proceedings which sought to revoke his staff privileges, voted to revoke those privileges, and served him with a notice of intent to suspend. He has also alleged that these decisions "will permanently impair [his] ability to seek and secure employment" in the future. Accordingly, qualified immunity is not warranted at this stage.

*Ryan*, 777 F. App'x at 246 (emphasis added).

In other words, this Court ruled in *this case* that it's clearly established that initiating a disciplinary proceeding can constitute an adverse employment action. That's the law of the case on this issue, and this Court should not disturb it. "Since, in the posture presented to us, this qualified immunity question is a purely legal one, and *Bollinger I* held that the defendants were not entitled to qualified immunity, that holding controls this appeal as law of the case." *Bollinger v. Oregon*, 172 F. App'x 770, 771 (9th Cir. 2006) (District Court, at summary judgment, should have followed Ninth Circuit's qualified immunity ruling from

defendant's appeal of a motion to dismiss absent relevant evidence).[2] Here, as is set forth below, the evidence at summary judgment did not materially change this point.

This Court's ruling was manifestly correct, as was the District Court's ruling that Appellants' actions – viewed in the light most favorable to Dr. Ryan – constituted adverse employment actions, particularly under the broad definition of that term. "The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights." *Coszalter v. City of Salem*, 320 F.3d 968, 974–75 (9th Cir. 2003).

## 1. Dr. Putnam Subjected Dr. Ryan To An Adverse Employment Action

Appellants do not dispute that it was clearly established that the *hospital* could not initiate a retaliatory investigation of Dr. Ryan. AOB 60-61. Backed into a corner, they argue that it was not clearly established that Appellant Dr. Putnam, as the PSA President and MEC chair, was not allowed to *cause such an investigation to be done* by presiding over MEC meetings where it was ordered and voting for it. *Id.*

---

[2] *Bollinger* is unpublished and therefore persuasive but not precedential. Fed. R. App. Proc. 32.1.

This is specious. Section 1983 would be a feeble tool if it only held liable those government actors who got their hands dirty with whatever physical act violated the plaintiffs' rights. In fact, it's very well established that state actors who direct, supervise, or acquiesce in constitutional violations are liable for them. Such a person is liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018), citing *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "[A] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; ***for his acquiescence in the constitutional deprivation***; or for ***conduct that showed a reckless or callous indifference to the rights of others***." *Keates*, 883 F.3d at 1243 [emphasis added], quoting *Starr*, 652 F.3d at 1208. This Court has found that proposition is clearly established. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018); *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (proposition that state actor can be liable for acquiescence in constitutional deprivations "has long been established"). For decades, this Court has consistently held that state actors may be liable for "condoning" or "ratifying" constitutional violations by another state

31

actor. *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998),

citing *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir.1991).

Appellants make no convincing argument why it matters that Dr. Putnam

acquiesced, ratified, and condoned violations of Dr. Ryan's rights through votes or

through supervising the MEC's actions. That argument is akin to demanding

authority for the proposition that it's possible to direct a violation of someone's

rights through text or TikTok. Moreover, Ninth Circuit law directly refutes the

assertion. In *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), the plaintiff

alleged in a Section 1983 case that the Los Angeles County Board of Supervisors

had, by indemnifying county sheriffs from punitive damage awards for excessive

force in bad faith, proximately caused the violation of plaintiffs' rights. This Court

upheld the District Court's denial of the Supervisor's claim of qualified immunity.

"[L]ocal legislators are not entitled to qualified immunity if they implement their

state-created power to indemnify police officers from punitive damage awards in

bad faith." *Id.* at 734.

Therefore, it was clearly established that Dr. Putnam could violate Dr.

Ryan's constitutional rights by implementing, acquiescing, ratifying, and

condoning the violation through his supervision and votes on the MEC.

**2.      Dr. Vintch Subjected Dr. Ryan To An Adverse Employment Action**

Appellants concede that Dr. Vintch was the PSA Vice-President and the MEC's Vice-Chair and voted to propose the Behavioral Agreement and to terminate Dr. Ryan's privileges if he did not accept it. AOB 65. They merely repeat Dr. Putnam's argument – that it was not clearly established she could violate Dr. Ryan's rights by voting for them to be violated. For the reasons set forth above, Ninth Circuit law clearly refutes that.

### 3. Dr. Lewis Subjected Dr. Ryan To An Adverse Employment Action

Appellants argue that Dr. Lewis, though he voted for the Behavioral Contract and for Dr. Ryan to revoke his privileges if he did not sign it, was not an officer of the PSA or MEC. (AOB at 66.) But by voting as he did, Dr. Lewis ratified, endorsed, and acquiesced in the MEC's unconstitutional actions. As is set forth above, it's clearly established under Ninth Circuit law that he can be held liable for doing so.

### 4. Dr. de Virgilio Subjected Dr. Ryan To An Adverse Employment Action

Appellants argue that because Dr. de Virgilio did not participate in the MEC vote to impose the Behavioral Contract or revoke Dr. Ryan's privileges, and because he had only a limited role in the FPPE, he did not do anything that was clearly established to be an adverse employment action. AOB at 66.

Not so. Dr. de Virgilio participated in the MEC meeting that directed the creation of the FPPE, led the creation of the FPPE, participated in the FPPE by contributing quotes complaining about Dr. Ryan's whistleblowing to the NIH and falsely stating Dr. Ryan's complaint had been deemed unfounded. ER 6:1193-94. He also participated in an MEC meeting at which the MEC decided to revoke Dr. Ryan's privileges when he did not accept the Behavioral Contract. ER 6:1259-61. Under clearly established Ninth Circuit law discussed above, this constituted acquiescing in, ratifying, and endorsing the unconstitutional retaliation against Dr. Ryan.

Appellants also argue that Dr. de Virgilio did not dictate what the FPPE recommended and that the MEC was free to accept or reject the FPPE recommendation. This argument ignores that Dr. de Virgilio specifically complained to the FPPE about Dr. Ryan making complaints to outside authorities, thus directing, ratifying and approving the FPPE's recommendation that Dr. Ryan "explore" dismissing Dr. Ryan or revoke his privileges. ER 8:1542-43. Appellants' quibbles about the FPPE are not truly arguments about qualified immunity; they are, once again, improper quarrels with the District Court's determination that there was a triable dispute of material fact about whether participating in the FPPE action could be an adverse employment action.

**E.     CLEARLY ESTABLISHED LAW DEMONSTRATES DR. RYAN SPOKE AS A PRIVATE CITIZEN**

Appellants next argue that it was not clearly established under relevant law that Dr. Ryan spoke as a private citizen.  (AOB at 70.)  This is a poorly disguised attack on the sufficiency of the evidence, and beyond this Court's jurisdiction on this appeal.  It's also wrong.

This Court has repeatedly found that "statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform."  *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) (internal quotations omitted), quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2. (9th Cir. 2008).  The scope of a plaintiff's job duties is a question of fact.  *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009).

The District Court found that it was "undisputed that Ryan eventually reported his concerns outside of Harbor-UCLA, and ***there is no evidence that demonstrates that Ryan's external reports were submitted pursuant to his professional duties at Harbor-UCLA.***"  ER 1:60 [emphasis added].  Appellants cannot attack that determination about the sufficiency of the evidence in this appeal, as the Court lacks jurisdiction to hear it.  *Est. of Anderson*, 985 F.3d at 730-31.

Appellants have never cited any evidence that *Appellants* believed that Dr. Ryan's reports to outside authorities were within the scope of his duties. They still don't try to argue that. Instead, they rely entirely on a false and misleading argument that *Dr. Ryan* admitted that reports to outside authorities were within the scope of his duties. (AOB 70-71.) Appellants claim Dr. Ryan admitted, in seeking indemnification for Dr. White's lawsuit against him, that the reports were within the scope of his duties. But, as the District Court specifically found, that misstates the record. Dr. Ryan asked Harbor-UCLA to indemnify him from Dr. White's lawsuit because it concerned his ***internal reports at Harbor-UCLA,*** not his whistleblowing to external agencies, which are the subject of this lawsuit. ER 8:1544. That's what the District Court found: "White's lawsuit did not address Ryan's external reports . . . ." ER 1:60. Appellants admit this. AOB 71.

Even if Dr. Ryan *had* said on one occasion that his external reports were within the scope of his employment, that would be one piece of evidence, countered by the evidence that Harbor-UCLA did not think that it was part of his job and that there was no rule or policy making it his job. That would leave, at a minimum, the triable issue of fact that the District Court found. ER 1:60. Again, even if Dr. Ryan had said that, Appellants pointed to no evidence that they knew or that they agreed and made decisions on that basis.

Finally, Appellants attempt a clumsy sleight of hand: they argue that because Dr. Ryan has pointed out that HIPAA permits him to gather information to report fraud, then his reports must be treated as within the scope of his duty. AOB 71. This is sheer sophistry. The fact that a statute would permit a public employee to be a whistleblower can't mean that the employee's *job* is to be a whistleblower. That reading would mean that it's impossible to bring a Section 1983 claim for retaliation against whistleblowing because whistleblowing is always speaking as an employee, not a private citizen. That's not the law.

Appellants' argument about Dr. Ryan's capacity is a poorly disguised quarrel with the District Court's finding that there was no evidence that he spoke in his private capacity, and is therefore improper on this appeal. It's also wrong.

## F.  APPELLANTS ATTEMPT TO DISGUISE AN ATTACK ON THE DISTRICT COURT'S FINDINGS ABOUT THE SUFFICIENCY OF THE EVIDENCE AS A LEGAL ARGUMENT

Next, Appellants argue that there was no clearly established law showing that their justifications for their treatment of Dr. Ryan didn't outweigh his First Amendment rights. AOB 72. This argument is both fundamentally deceptive and wrong.

### 1.  Appellants Argument Is An Attack On The District Court's Findings On Sufficiency of the Evidence

First, Appellants' argument is actually an attack on the District Court's determination that genuine disputes of material fact preclude summary judgment on the issue of justification. That's improper and beyond the scope of this Court's jurisdiction on this appeal. *Est. of Anderson*, 985 F.3d at 730-31.

Appellants aren't arguing that it wasn't clearly established whether or not they could fire Dr. Ryan because his whistleblowing caused disruption. *They deny that's what they did.* Instead, they argue that their actions against Dr. Ryan were justified because they were *actually* motivated by **his other alleged bad behavior in the workplace**, or that Dr. Ryan's whistleblowing was, at most, only one factor in their decision, and it wasn't clearly established that they couldn't do ***that***. AOB 74-75.

But the District Court specifically ***found that there were triable issues of fact about whether those reasons were pretextual*** and whether Appellants would have made the same decisions absent Dr. Ryan's protected speech. In response to Dr. Putnam's and Dr. Vintch' motion, the District Court held:

> Plaintiff offers evidence that suggests defendants' explanations for the adverse employment actions of directing the FPPE, voting to propose a Behavioral Agreement, and voting to revoke Ryan's clinical privileges if he refused the Behavioral Agreement were pretextual. ER 1:64.

Similarly, the District Court found that triable issues of material fact about whether Dr. de Virgilio's and Dr. Lewis' proffered justifications were pretextual, and given that evidence of pretext, whether they would have taken the same actions absent Dr. Ryan's speech.  ER 1:33-34.

Put another way, Appellants are saying "if you presume as true that our motivations were at least in part what we say they were, there's no clearly established law saying we were wrong."  But Appellants *aren't entitled to that presumption of sincerity,* either at summary judgment or on appeal.  It reverses the appropriate presumption, which is that Dr. Ryan is entitled to an interpretation of the facts in the light most favorable to him.  *Ellins*, 710 F.3d at 1064.  The District Court found a triable dispute of fact about whether Appellants' proffered justification was real or pretextual.  The record is replete with evidence to support that dispute – as the District Court's two very thorough and well-reasoned orders show – but that's not the point, however much Appellants struggle to make it so. The point is that *Appellants cannot attack that determination on this limited interlocutory appeal*.

Appellants cite cases for the proposition that because of the fact-intensive nature of justification analysis, it's difficult to show that it was clearly established that a particular justification did not outweigh particular speech.  But *none of those cases involved a genuine dispute of material fact about whether the proffered*

*justification was the real one.* Rather, they involve the balancing of *undisputed* justifications. For instance, in *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998), it was undisputed that the appellant's speech caused some disruption, and appellant did not argue that the reliance on the disruption was pretextual. By contrast, in the cases Appellants cite where there *was* a factual dispute over whether a justification was pretextual, this Court did not apply the "clearly established" analysis to justification, because it *couldn't.* For instance, in *Eng v. Cooley*, 552 F.3d 1062, 1074 (9th Cir. 2009), this Court found that disputes of fact about the employer's motives precluded summary judgment on theories of justification or inevitability. This Court analyzed whether Eng's First Amendment right was clearly established, but *didn't even engage* in an analysis of whether the lack of justification was clearly established *because that issue was disputed. Id.* at 1075-76.

Appellants' unstated proposition – that Dr. Ryan must prove that it was clearly established that their proffered justification was inadequate *even if there's a dispute over whether it was pretextual* – is a logical fatuity. If that were the law, then a government employer could make up any justification for retaliatory action, however feeble or unsupported by evidence, and the plaintiff would have to find cases that said that the justification would be insufficient *as if it were true.* But that's not the law. Appellants cite no case – nor can they – that says that this

Court, in evaluating a claim of qualified immunity, treats the defendant's purported justification as sincere, and requires a plaintiff to show clearly established precedent that it's inadequate, even if the District Court finds a dispute about whether it's pretextual.

Later in their brief, Appellants revive this argument under a new guise – they suggest that the District Court erred in finding that there were disputes of fact about whether the hospital's interests in effective provision of healthcare could have been served by intermediate steps. AOB 79. They argue that no clearly established precedent suggests that following a harsher path rather than an intermediate path shows that a disciplinary action was not justified. But once again Appellants do not accurately depict the District Court's ruling. The District Court made observations about the failure to follow intermediate steps in service of its conclusion that there was a genuine dispute of material fact over whether Appellants' purported justifications were pretextual:

> Plaintiff offers evidence that suggests defendants' explanations for the adverse employment actions of directing the FPPE, voting to propose a Behavioral Agreement, and voting to revoke Ryan's clinical privileges if he refused the Behavioral Agreement, were pretextual. This includes "comparative evidence" that "similarly situated employees," including Putnam, were treated "more favorably" than

plaintiff (see Earl, 658 F.3d at 1113) for unprofessional conduct such as yelling, ***and evidence that defendants failed to take intermediate steps such as counseling prior to imposing the FPPE, even though "progressive steps" are recommended by the PSA Bylaws***. ER 1:64 [emphasis added].

Once again, Appellants are trying to sneak into this appeal a challenge to the District Court's findings on the sufficiency of the evidence.

Therefore, Appellants' argument fails as outside this Court's jurisdiction on this appeal.

### 2. Appellants' Argument Is Also Wrong; It Is Clearly Established That Their Proffered Justification Is Inadequate

Even if this Court accepted Appellants' fanciful approach, their argument would still be wrong. At the time Appellants retaliated against Dr. Ryan, it was clearly established that a public employer's concern for workplace disruption does not justify retaliating against a public employee for whistleblowing over violations of law. *See, e.g., Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (clearly established that employer not justified in retaliating against report of illegal conduct); *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 427 (9th Cir. 1995) ("In other words, the County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers

as a legitimate means of avoiding the disruption that necessarily accompanies such exposure."); *Rivero v. City & Cnty of S.F.*, 316 F.3d 857, 866-67 (9th Cir. 2002).

Appellants scorn these authorities because they do not involve decisions by peer review bodies. AOB at 76. They argue that California law reflects a strong public policy in favor of the autonomy of entities like the MEC. But Appellants cite no law supporting the proposition that the autonomy should include broader freedom to retaliate against whistleblowing. This law is more than sufficient to show that it was clearly established that Appellants could not justify retaliating against Dr. Ryan for reporting misconduct to the NIH and District Attorney.

## G. APPELLANTS VIOLATED DR. RYAN'S FIRST AMENDMENT RIGHTS

Finally, Appellants argue that they didn't violate Dr. Ryan's First Amendment rights at all. AOB at 82. But this argument is simply repeats their assertions, refuted above, that there's no authority for the proposition they could violate Dr. Ryan's rights through their leadership and their MEC votes. As is set forth above, that's wrong – they could and did violate Dr. Ryan's rights through endorsing, ratifying, and approving a retaliatory investigation. Appellants also argue that they did not violate Dr. Ryan's rights because their interest in punishing Dr. Ryan's workplace behavior outweighed his First Amendment rights. AOB at 84. Once again, Appellants doggedly ignore the District Court's conclusion that

there was a genuine issue of triable fact about whether those justifications were pretextual.  The argument is no more persuasive when repeated, and is outside this Court's jurisdiction on this appeal.

## VII.   CONCLUSION

For the foregoing reasons, this Court should dismiss the appeal to the extent it seeks relief outside this Court's jurisdiction and affirm the District Court to the extent Appellants make faulty legal arguments.

DATED:  January 27, 2023          BROWN WHITE & OSBORN LLP


By  *s/Kenneth P. White*
_____
                THOMAS M. BROWN
                KENNETH P. WHITE
             Attorneys for Plaintiff-Appellee
                   Timothy Ryan

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pER

**9th Cir. Case Number(s)**  22-55144 and 22-55406

I am the attorney or self-represented party.

This brief contains 9,815 words, excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/Kenneth P. White_____ **Date** January 27, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pER

**9th Cir. Case Number(s)**  22-55144 and 22-55406

The undersigned attorney or self-represented party states the following:

[ X ]   I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  *s/Kenneth P. White*          **Date**  January 27, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/18*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed Appellee's Consolidated

Answering Brief with the Clerk of the Court for the United States Court of Appeals

for the Ninth Circuit by using the appellate CM/ECF system on **<u>January 27, 2023</u>**.

DATED:  January 27, 2023            BROWN WHITE & OSBORN LLP

By  *s/Kenneth P. White*
_____

THOMAS M. BROWN
KENNETH P. WHITE
Attorneys for Plaintiff-Appellee
Timothy Ryan