**Nos. 22-55144 and 22-55406**

Date of Panel Decision: June 23, 2023
Wallace and Owens, Circuit Judges, and Fitzwater, District Judge

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

─────────────────────────────

TIMOTHY RYAN, M.D.,
*Plaintiff and Appellee*,

v.

BRANT PUTNAM, M.D., et al.,
*Defendants and Appellants*,

and

ANISH MAHAJAN, M.D., et al.,
*Defendants*.

─────────────────────────────

AND RELATED APPEAL

─────────────────────────────

APPEALS FROM UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION, No. 2:17-CV-05752-CAS-RAO
HON. CHRISTINA A. SNYDER, DISTRICT JUDGE PRESIDING

─────────────────────────────

# PETITION FOR PANEL REHEARING AND REHEARING EN BANC
─────────────────────────────

BALLARD ROSENBERG GOLPER & SAVITT, LLP
LINDA MILLER SAVITT
JOHN J. MANIER
LINDA B. HUREVITZ
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436
T: 818-508-3700 | F: 818-506-4827

Attorneys for Defendants and Appellants BRANT PUTNAM, M.D.,
JANINE VINTCH, M.D., CHRISTIAN DE VIRGILIO, M.D., and
ROGER LEWIS, M.D., and Defendants ANISH MAHAJAN, M.D.,
HAL F. YEE, M.D., and MITCHELL KATZ, M.D.

# TABLE OF CONTENTS

**Page**

FRAP 35 STATEMENT ................................................................. 6

BACKGROUND ........................................................................... 9

    A.   Dr. Ryan's Reports ................................................. 9

    B.   Peer Review Votes ................................................ 10

    C.   Procedural Summary ............................................ 13

ARGUMENT ............................................................................. 14

    I.    The Panel Decision Conflicts with Authoritative Precedent on What May Constitute Clearly-Established Law. ................................................. 14

        A.   In Concluding that Appellants' Individual Committee Votes Were Adverse Employment Actions, the Panel Relies on a Broad, General Proposition on Causation, Rather Than the High Degree of Specificity Required by Binding Precedent to Constitute Clearly-Established Law. ...... 15

        B.   In Concluding the Vote to Initiate the FPPE Was an Adverse Employment Action, the Panel Relies on Materially-Distinguishable Precedents, Which the Supreme Court Has Held Cannot Constitute Clearly-Established Law. .......................... 20

# TABLE OF CONTENTS (continued)

**Page**

II.  There Was No Briefing on Whether Complaints of
Dr. Ryan's Unprofessional Behavior Were Largely
Unrelated to His Protected Activity, and the Panel's
Conclusion Was Based on Materially-
Distinguishable Authority Rather Than Clearly-
Established Law....................................................................25

CONCLUSION ................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................28

APPENDIX

Panel Memorandum Decision (June 23, 2023)............................30

FPPE Report (ER 8:1539-43) .........................................................38

Notice of Charges (ER 8:1817-23) .................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bonni v. St. Joseph Health Sys.*,
11 Cal. 5th 995 (2021) .................................................................... 27

*Brooks v. City of San Mateo*,
229 F.3d 917 (9th Cir. 2000) .......................................................... 23

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) (*en banc*) ................ 7, 14, 15, 16, 17, 19

*Dahlia v. Stehr*,
491 F. App'x 799 (9th Cir. 2012) .................................................... 14

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ............................................................ 7, 16, 17

*Eng v. Cooley*,
552 F.3d 1062 (9th Cir. 2009) .................................................. 14, 25

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999) .......................................................... 19

*Humann v. City of Edmonds*,
No. C13-101 MJP, 2014 WL 4161974 (W.D. Wash.
Aug. 19, 2014) ................................................................................ 14

*Johnson v. Duffy*,
588 F.2d 740 (9th Cir. 1978) ..................................................... 15, 17

*Malley v. Briggs*,
475 U.S. 335 (1986) ........................................................................ 24

*Moser v. Las Vegas Metro. Police Dep't*,
984 F.3d 900 (9th Cir. 2021) .......................................................... 26

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Mueller v. Auker,*
700 F.3d 1180 (9th Cir. 2012) ..................................................... 7, 16, 17

*Poland v. Chertoff,*
494 F.3d 1174 (9th Cir. 2007) ....................................... 7, 21, 22, 23, 24

*Rivas-Villegas v. Cortesluna,*
142 S. Ct. 4 (2021) (*per curiam*) .................................. 8, 18, 20, 25, 27

*Ryan v. Putnam,*
777 F. App'x 245 (9th Cir. 2019) ................................. 13, 18, 21, 23, 24

*Sjurset v. Button,*
810 F.3d 609 (9th Cir. 2015) ................................................................ 24

*Ulrich v. City & Cnty. of S.F.,*
308 F.3d 968 (9th Cir. 2002) ....................................... 8, 21, 22, 23, 24

*United States v. Johnson,*
256 F.3d 895 (9th Cir. 2001) (*en banc*) ........................................ 17, 24

*White v. Pauly,*
580 U.S. 73 (2017) (*per curiam*) ........................................... 6, 7, 16, 17

**STATUTES**

42 U.S.C. § 1983 ............................................................................. 6, 8, 13

**MISCELLANEOUS**

9th Cir. Gen. Order 4.2 ........................................................................... 25

## FRAP 35 STATEMENT

This petition involves qualified immunity, a principle which "is important to society as a whole." *White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*) (cleaned up). The Panel's memorandum decision affirming the denial of qualified immunity on summary judgment conflicts with decisions of the Supreme Court and this Court.

In this 42 U.S.C. § 1983 action, Plaintiff/Appellee Dr. Timothy Ryan claims Defendants/Appellants Drs. Brant Putnam, Janine Vintch, Christian de Virgilio, and Roger Lewis committed First Amendment retaliation after he reported alleged medical fraud and research misconduct. Ryan alleges two sets of adverse employment actions:

● Putnam, de Virgilio, and several other peer review committee members participated in a vote to initiate a Focused Professional Performance Evaluation (FPPE) concerning allegations that Ryan engaged in abusive, harassing conduct detrimental to patient care, and violated patient and personal privacy.

● Faced with the independent FPPE committee's unanimous findings of Ryan's unprofessional conduct, Putnam, Vintch, Lewis, and several other peer review committee members participated in another

6

vote to recommend a behavioral agreement or revocation of Ryan's medical staff privileges for rejecting that agreement.

There is no clearly-established law holding *individual committee members' votes* similar to those by Appellants may constitute actionable adverse actions. In concluding otherwise, the Panel relies on *general statements in a footnote* about causing a constitutional deprivation, either directly or by setting in motion a series of acts. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 n.22 (9th Cir. 2013) (*en banc*), *cert. denied sub nom. City of Burbank v. Dahlia*, 571 U.S. 1198 (2014). The Panel decision conflicts with authoritative holdings that clearly-established law must be stated at a high degree of specificity and particularized to the facts of the case—rather than broad, general propositions, such as those in the *Dahlia* footnote. *See, e.g., District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *White*, 580 U.S. at 79-80; *Mueller v. Auker*, 700 F.3d 1180, 1185 (9th Cir. 2012).

In concluding that merely voting to initiate FPPE factfinding was itself an adverse action under clearly-established law, the Panel relies on cases which based liability on investigatory inquiries *combined with other actions. Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007);

7

*Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 977 (9th Cir. 2002). But this conflicts with the Supreme Court's holding—summarily reversing this Court's denial of qualified immunity—that materially-distinguishable cases cannot constitute clearly-established law. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (*per curiam*).

The Panel also held concerns with Dr. Ryan's unprofessional behavior didn't adequately justify the peer review votes under clearly-established law because they were "largely unrelated to his reports of fraud." Mem. 6-7. But this relatedness issue was *unbriefed* on appeal and below, and the Panel cites only one distinguishable case—rather than clearly-established law—to support its conclusion.

Rehearing is exceptionally important to resolve these conflicts on the standard for defining clearly-established law for qualified immunity—especially in the healthcare context. The Panel decision would discourage physicians from serving on legally-mandated and essential peer review committees, lest they face individual §1983 liability for merely voting to initiate independent factfinding in response to a complaint, and to recommend action in accordance with that investigation's unanimous conclusions.

# BACKGROUND

## A.    Dr. Ryan's Reports

Appellants are employed by the County of Los Angeles (County) as physicians at Harbor-UCLA Medical Center (Harbor-UCLA), members of the Harbor-UCLA Professional Staff Association (PSA), and current or former members of the PSA's Medical Executive Committee (MEC). From 2015 to 2018, Dr. Putnam was PSA President and MEC Chair, Dr. Vintch was PSA Vice-President and MEC Vice-Chair, and Dr. de Virgilio chaired the Surgery Department. ER 1:4-5, 42-43.

The County employed Dr. Ryan as a vascular surgeon at Harbor-UCLA from October 2013 to October 2018. Like all physicians, Ryan was required to maintain PSA membership and privileges to practice at Harbor-UCLA. ER 1:4, 42.

In 2014-2015, Dr. Ryan reported alleged research misconduct on a federally-funded trial to the National Institutes of Health (NIH), and informed a prosecutor of a purported "kickback" and fraud scheme involving use of medical devices in ostensibly unnecessary surgeries. Ryan previously had made internal reports on these topics. ER 1:5-8, 43-46. The NIH validated Ryan's allegation that Rodney White, M.D.,

and others were ineligible to participate as independent endovascular operators in the research trial, but found no research misconduct and dropped the matter. ER 1:6, 44. No government entity has brought criminal or civil charges as a result of Ryan's reports. *See* ER 3:438, 7:1487-88, 1497-99, 9:2076-77.

### B.   Peer Review Votes

Dr. White submitted a privileged corrective action request to the PSA in August 2015 and an "addendum" in or about November 2015, implicating Dr. Ryan in conduct detrimental to patient care and disruptive to Harbor-UCLA operations, including harassment and unscrupulous conduct, plus violations of patient and personal privacy that White had previously raised to Human Resources. ER 1:9, 17-18, 46-48, 8:1797-98. Confronted with White's serious allegations, several MEC members—including Drs. Putnam, de Virgilio, and others, but not Drs. Vinch or Lewis—voted in December 2015 to initiate a Focused Professional Performance Evaluation of Ryan. As Surgery Department Chair, de Virgilio selected a five-member committee—none of whom are parties to this litigation—to conduct the FPPE. ER 1:5, 10, 48-49, 3:339-40.

After factfinding and witness interviews, the FPPE committee issued a *unanimous* report in February 2016 that found Dr. Ryan's abusive behavior towards physicians, nurses, and other colleagues seriously and adversely impacted their well-being and the care of patients, and his unauthorized access of patient files may have been unlawful. The committee recommended the MEC consider actions—such as dismissal, counseling, or behavioral limits and monitoring—to remedy the chaos Ryan caused. ER 1:11-12, 49-50, 8:1539-43.

Before the MEC took any action, in July 2016, Dr. Ryan and his lawyer appeared before the MEC to respond to the FPPE report. MEC members—including Drs. Putnam, Vintch, and Lewis, and several others who Ryan never sued (although not Dr. de Virgilio)—deliberated and collectively voted to *recommend* alternative corrective actions: require Ryan to enter into a behavioral contract or, if he rejected this, revoke his PSA membership and privileges. ER 1:12-13, 50-51. Ryan rejected the proposed behavioral contract, and argues it contained illegal provisions. ER 1:13-15, 51-53.

The PSA notified Dr. Ryan in October 2016 that it was moving to revoke his PSA membership and privileges, finding that disciplinary

action was justified to safeguard employees, trainees, and patients, but that the action wouldn't become final—and Ryan's PSA membership and staff privileges would remain in place—until Ryan exhausted or waived his appeal and hearing rights. Ryan appealed, and a judicial review committee hearing was initiated. ER 1:16-17, 53-54.

The PSA issued Dr. Ryan a Notice of Charges which provided a non-exclusive specification of inappropriate, unprofessional, and disruptive conduct as found in the FPPE report that fell "well below expected standards for professional conduct" and violated the PSA Bylaws. This included specific instances of abusive behavior towards colleagues, such as "[o]penly and loudly criticizing other PSA members in front of multiple Medical Center and PSA staff in a disruptive manner," "[o]penly threatening to call external agencies to conduct investigations," and "[o]penly making unfounded accusations in an angry manner." The latter two items were omitted from a subsequent amended notice. ER 1:17, 54, 8:1817-32. The appellate hearing was mutually dismissed in June 2018, without determination of the merits, after Ryan's PSA membership and privileges lapsed. ER 1:17, 54-55.

12

### C.    Procedural Summary

Dr. Ryan filed this §1983 action on August 3, 2017. *See* ER 9:2071-83, 2087-88. The District Court (the late Hon. Manuel L. Real) granted a defense motion to dismiss the lawsuit based on qualified immunity on February 15, 2018, but this Court reversed and remanded. *See Ryan v. Putnam*, 777 F. App'x 245, 246 (9th Cir. 2019) (*Ryan I*) (Owens, R. Nelson, and Miller, JJ.).

Drs. Putnam and Vintch, and Drs. de Virgilio and Lewis, filed separate summary judgment motions, based in part on qualified immunity. The District Court (Hon. Christina A. Snyder) denied summary judgment for all four Appellants in orders issued January 10, 2022 and March 22, 2022; the latter order granted summary judgment for three other defendants. ER 1:2-76. The Panel decision affirms the denials of summary judgment based on qualified immunity. *See* Mem. 2 (Wallace, Owens, and Fitzwater, JJ.).

13

## ARGUMENT

## I.  The Panel Decision Conflicts with Authoritative Precedent on What May Constitute Clearly-Established Law.

This Court has held a plaintiff claiming First Amendment retaliation must prove: (1) he spoke "on a matter of public concern"; (2) he spoke "in the capacity of a private citizen and not a public employee"; and (3) the government "took adverse employment action" in which protected speech "was a substantial or motivating factor." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (cleaned up), *cert. denied*, 558 U.S. 1110 (2010). An adverse employment action generally is one that is "reasonably likely to deter employees from engaging in protected activity." *Dahlia*, 735 F.3d at 1078.

In at least one unpublished decision, this Court has upheld qualified immunity where there was no clearly-established law in connection with whether the plaintiff was subjected to an adverse employment action. *See Dahlia v. Stehr*, 491 F. App'x 799, 801 (9th Cir. 2012) (defendant entitled to qualified immunity because this Court hadn't previously decided "whether being placed on administrative leave with pay constitutes an adverse employment action"); *Humann v.*

14

*City of Edmonds*, No. C13-101 MJP, 2014 WL 4161974, at *6 (W.D.

Wash. Aug. 19, 2014) (same result for reappointment and layoff based

on "independent action eliminating funding for the position").

> **A.  In Concluding that Appellants' Individual Committee Votes Were Adverse Employment Actions, the Panel Relies on a Broad, General Proposition on Causation, Rather Than the High Degree of Specificity Required by Binding Precedent to Constitute Clearly-Established Law.**

The Panel rejects Appellants' assertion that their individual votes

as MEC members regarding Dr. Ryan aren't adverse employment

actions under clearly-established law. But the Panel's sole citation is to

a *footnote* which states:

> … Anyone who causes any citizen to be subjected to a constitutional deprivation is also liable…. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Dahlia*, 735 F.3d 1060, at 1078 n.22 (cleaned up), *quoted in* Mem. 3-4

(citing *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir.

1999), and *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

This is precisely the kind of "broad general proposition" that this Court and the Supreme Court have emphatically held *insufficient* to constitute "clearly established law." *Mueller*, 700 F.3d at 1185. Instead, the law "requires a high degree of specificity." *Wesby*, 138 S. Ct. at 590 (cleaned up, citation omitted). "The clearly established law must be particularized to the facts of the case," or else a plaintiff "would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 580 U.S. at 79 (cleaned up). Except in rare cases of "obvious" misconduct (which this case obviously isn't), the court must "identify a case" where a public official "acting under similar circumstances" as a defendant "was held to have violated" the Constitution. *Id.* at 79-80.

*Dahlia* is no such case. It addressed a potentially adverse action that Dr. Ryan never faced—placement on administrative leave. 735 F.3d at 1078. Footnote 22 added that "particular threats and harassment" may constitute adverse actions, and allowed the plaintiff to "seek leave to amend his complaint to clarify his allegations." *Id.* at

1078 n.22. It was in this context that the Court made the general observations on causation quoted by the Panel. *Id.*, *quoted in* Mem. 3-4.

At a minimum, reasonable judges may "disagree" over whether these footnote statements were "necessary to the resolution" of the *Dahlia* appeal or merely dicta. *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (*en banc*). Even if viewed as precedential, the observations are *far too general* to constitute clearly-established law on the specific question of whether Appellants' individual MEC votes constitute adverse employment actions. *Wesby*, 138 S. Ct. at 590; *White*, 580 U.S. at 79; *Mueller*, 700 F.3d at 1185.

The cases cited in *Dahlia*'s footnote 22 aren't cited by the Panel, and are factually inapposite. One individual found liable in *Gilbrook* conducted an investigation and made the initial termination decisions, and another affirmed those decisions after conducting pre-termination "*Skelly*" hearings. 177 F.3d at 849-51 & n.1, 853-57. In *Johnson v. Duffy*, this Court held defendants who didn't participate in depriving plaintiff of his prison work earnings without due process could be liable for their "omission to perform duties imposed by state law" resulting in the unconstitutional deprivation. *Id.* at 742-43.

17

None of these authorities addressed facts remotely similar to Dr. Ryan's attempt to hold physicians personally liable for individual peer review committee votes. Because these cases are "materially distinguishable," they *cannot* constitute clearly-established law for the proposition that such individuals' votes are legally sufficient to hold each of them liable for "causing" a constitutional violation or under a "setting in motion" theory. *Rivas-Villegas*, 142 S. Ct. at 7.

Remarkably, the Panel decision marks *the fourth failed attempt* in this litigation to show that Appellants may be liable for individual MEC votes under clearly-established law.

● *Strike one:* In opposing summary judgment, Dr. Ryan argued "nothing material has changed" since *Ryan I*, ER 7:1507-09, which found Ryan's *pleadings* sufficiently alleged an adverse action under clearly-established law. *Ryan I*, 777 F. App'x at 246. Ryan ignored Appellants' summary judgment evidence, which wasn't before the *Ryan I* panel. *See* ER 3:462-592, 4:594-846, 5:848-73, 996-1029, 7:1512-34, 8:1536-1832, 9:1834-1991.

● *Strike two:* The District Court opined that "courts apply the qualified immunity analysis in the same manner to defendants acting

18

in concert" as to individual defendants, but relied solely on *three out-of-circuit cases*. ER 1:36-37, 73-74 (citing one published 8th Circuit decision, an unpublished 5th Circuit decision, and a Missouri district court decision).

● *Strike three:* In his Answering Brief on this appeal, Dr. Ryan shifted gears and relied on authorities holding *supervisors and managers* liable for unconstitutional actions they directed, ratified, or approved, or in which they acquiesced. *See* Ans.Br. 30-34.

By rejecting these prior approaches, the Panel tacitly (and correctly) acknowledges *none* of them properly articulates clearly-established law relevant to the adverse employment action issue in this case. But the Panel's reliance on the generalized statement from the *Dahlia* footnote fares no better, and fatally conflicts with precedents of the Supreme Court and this Court requiring clearly-established law to be specifically stated and factually particularized. Rehearing should be granted to resolve the Panel's conflict with authoritative precedent.

**B.    In Concluding the Vote to Initiate the FPPE Was an Adverse Employment Action, the Panel Relies on Materially-Distinguishable Precedents, Which the Supreme Court Has Held Cannot Constitute Clearly-Established Law.**

The Panel also holds "the initiation of the Focused Professional Performance Evaluation" was a distinct adverse employment action under clearly-established law. Mem. 3; *see* ER 1:10, 12-13, 18, 48-51. The Panel cites one case as holding "a peer review committee's investigation of a doctor that threatened to revoke his clinical privileges was an adverse employment action," Mem. 3 (citing *Ulrich*, 308 F.3d at 977), and another as holding "actions for which the disciplinary outcome is uncertain—such as an investigatory inquiry—are adverse employment actions." Mem. 4 (citing *Poland*, 494 F.3d at 1180). Under binding precedent, however, *Ulrich* and *Poland* cannot constitute clearly-established law on the adverse action requirement, because both cases are "materially distinguishable" from the instant undisputed facts. *Rivas-Villegas*, 142 S. Ct. at 7.

In *Ulrich*, the "investigation that threatened to revoke" the plaintiff's clinical privileges was *combined* with later actions that negatively affected his employment prospects—"marring his

20

employment record" by refusing to rescind his resignation and making an adverse action report. *Ulrich*, 308 F.3d at 977. *Ulrich* doesn't clearly establish that an "investigation" *by itself*–whether or not it confirms the underlying allegations—is legally sufficient to constitute an adverse employment action. Nor did *Ryan I* adopt such a reading, instead citing *Ulrich* for the proposition that a "decision to initiate disciplinary proceedings …, *when combined with a negative effect on employment prospects*, is enough to satisfy the 'adverse employment action' requirement." *Ryan I*, 777 F. App'x at 246 (italics added) (finding Ryan's *pleading allegations* "sufficiently similar to *Ulrich* to satisfy the clearly established prong … at this early stage").

In *Poland*, this Court described *both* Special Agent Hillberry's initiation of a Customs Service "administrative inquiry into [plaintiff] Poland's performance" *and* Poland's resulting adverse reassignment as "adverse employment actions," and found Hillberry's retaliatory animus "should be imputed to the Customs Service" (the only defendant in the case). 494 F.3d at 1180. But the Court didn't analyze the administrative inquiry point, and instead only provided a brief parenthetical assertion that *inaccurately* suggests *Ulrich* held "a hospital's investigation of a

21

doctor that threatened to take away the doctor's clinical privileges was an adverse employment action" by itself. *Id.* (citing *Ulrich*, 308 F.3d at 977).

The *Poland* court extensively analyzed the "more difficult question" of a causal link between Hillberry's animus "and the Customs Service's adverse employment action of transferring Poland"—a decision made by a different, unbiased superior. 494 F.3d at 1180-81. The Court held the bias of a subordinate who "sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action … is imputed to the employer" *if* "the biased subordinate influenced or was involved in the decision or decisionmaking process." *Id.* at 1182. The Court specified "*Hillberry's initiation of the administrative inquiry, on its own, would not be sufficient to impute Hillberry's animus to the Customs Service's decision to transfer Poland* if the Customs Service had shielded the inquiry it subsequently undertook from Hillberry's influence." *Id.* at 1183 (italics added). But the Court discussed evidence showing that "Hillberry's animus had a pervasive influence on the administrative inquiry *that led to the adverse employment action.*" *Id.* (italics added).

*Poland* doesn't address this Court's earlier holding that a defendant cannot be liable for conduct that isn't "sufficiently final to constitute an adverse employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 929-30 (9th Cir. 2000) (performance review subject to modification wasn't materially adverse); *see Poland*, 494 F.3d at 1184-86 (discussing *Brooks* only as to constructive discharge). Nor does *Poland* offer any basis, other than mischaracterizing *Ulrich*, for suggesting an administrative inquiry would be sufficiently final *by itself*, absent an adverse result of the inquiry (like the transfer in *Poland*) or "a negative effect on employment prospects" (as in *Ulrich*). *Ryan I*, 777 F. App'x at 246.

*Poland*'s depiction of the administrative inquiry as an adverse action by itself was "made casually and without analysis" of *Ulrich*, *Brooks*, or other authority, was "uttered in passing without due consideration of the alternatives," and was "merely a prelude to another legal issue that command[ed] the panel's full attention"—the "adverse employment action" of Poland's unfavorable transfer. As such, *Poland*'s assertion isn't clearly "binding on later panels," *Johnson*, 215 F.3d at 915, much less sufficient to qualify as clearly-established law.

23

Conspicuously, *Ryan I*, 777 F. App'x at 246, didn't go as far as *Poland* in its description of *Ulrich*.

No precedent cited by this Court, the District Court, *or* Dr. Ryan makes it "sufficiently clear that every reasonable official" in the positions of Drs. de Virgilio (as Surgery Chair) or Putnam (as MEC Chair) "would have understood" that initiating the FPPE, *without more*, was an adverse employment action. *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) (cleaned up). The panel decision flouts the established principle that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Although the District Court concluded the FPPE "threatened" to revoke Dr. Ryan's staff privileges, it didn't find the FPPE negatively impacted his employment prospects *by itself*, and Ryan offered no competent evidence to this effect. ER 1:27-28, ER 2:219-20, 3:425, 5:1105-06, 7:1350, 1480. The materially-distinguishable cases cited by the Panel cannot constitute clearly-established law for holding Drs. De Virgilio or Putnam personally liable for participating in the MEC vote to initiate the FPPE. *Rivas-Villegas*, 142 S. Ct. at 7.

24

II. **There Was No Briefing on Whether Complaints of Dr. Ryan's Unprofessional Behavior Were Largely Unrelated to His Protected Activity, and the Panel's Conclusion Was Based on Materially-Distinguishable Authority Rather Than Clearly-Established Law.**

Appellants maintain no clearly-established law shows Dr. Ryan's free speech rights outweighed Appellants' justifications in voting to (A) initiate the FPPE based on complaints of Ryan's unprofessional behavior and (B) recommend privilege revocation based on the FPPE's factual findings that Ryan's behavior negatively impacted patient care and healthcare professionals. ER 1:10-12, 18, 48-50; *see Eng*, 552 F.3d at 1070 (adequate justification is an affirmative defense to First Amendment retaliation claim). The Panel's sole basis for rejecting qualified immunity on this defense was its assertion that the concerns about Ryan were "largely unrelated to his reports of fraud." Mem. 6.

But rehearing should be granted because the Panel's issue was never briefed by the parties or discussed by the District Court. *See* 9th Cir. Gen. Order 4.2 (posted Sept. 8, 2022). Dr. Ryan's summary judgment opposition didn't address whether there was clearly-established law on justification. ER 3:450-53, 459, 7:1506-10. The District Court concluded Appellants couldn't have reasonably believed

25

"the MEC's interests in promoting the efficiency and effectiveness of the provision of healthcare services to Harbor-UCLA patients" outweighed Ryan's free-speech interests. ER 1:37-38, 74. In this Court, Ryan echoed the District Court's reasoning on clearly-established law and accused Appellants of attacking the finding of factual issues on justification. Ans.Br. 37-43. Even at oral argument on June 6, 2023, the Panel didn't ask whether the MEC's concerns about Ryan were related to his protected activity. Instead, this issue was raised for the first time in the Panel decision. Mem. 6-7.

Moreover, the lone authority the Panel cites on this issue, *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900 (9th Cir. 2021), didn't discuss whether a defendant's justification for an ostensible adverse employment action was *unrelated* to the plaintiff's protected speech. Instead, this Court only addressed an affirmative assertion that the plaintiff's speech threatened the employer's legitimate interests. *Id*. at 908-11. This makes *Moser* "materially distinguishable," so it can't be clearly-established law on the Panel's proposition that a justification purportedly unrelated to protected speech isn't an affirmative defense to a First Amendment retaliation claim. *Rivas-Villegas*, 142 S. Ct. at 7.

26

The adequate justification defense is particularly important in the healthcare context, because the hospital peer review process is "mandated by statute … and supplies the foundation for public oversight of the medical profession …." *See Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th 995, 1013 (2021) (citations omitted). The Panel's decision would chill all peer review fact-finding and investigations— including those that exonerate physicians. Rehearing should be granted to permit further briefing and argument on the unbriefed issue raised by the Panel.

## CONCLUSION

Appellants respectfully ask this Court to grant this rehearing petition.

DATED: July 7, 2023

BALLARD ROSENBERG
GOLPER & SAVITT, LLP

By: _____

John J. Manier
Attorneys for Defendants and Appellants
BRANT PUTNAM, M.D., JANINE
VINTCH, M.D., CHRISTIAN DE
VIRGILIO, M.D., and ROGER LEWIS,
M.D., and Defendants ANISH
MAHAJAN, M.D., HAL F. YEE, M.D.,
and MITCHELL KATZ, M.D.

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 22-55144 and 22-55406

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[**x**] Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words: 3,896.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature**   /s/ John J. Manier          **Date**: July 7, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                        *Rev. 12/01/21*

28

# APPENDIX

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| TIMOTHY RYAN, M.D., an individual, | No. 22-55144 |
| Plaintiff-Appellee, | D.C. No. 2:17-cv-05752-CAS-RAO |
| v. | |
| BRANT PUTNAM, M.D., an individual; JANINE VINTCH, M.D., an individual, | MEMORANDUM[*] |
| Defendants-Appellants, | |
| and | |
| ANISH MAHAJAN, M.D.; et al., | |
| Defendants. | |

| | |
|---|---|
| TIMOTHY RYAN, M.D., an individual, | No. 22-55406 |
| Plaintiff-Appellee, | D.C. No. 2:17-cv-05752-CAS-RAO |
| v. | |
| CHRISTIAN DE VIRGILIO, M.D.; ROGER LEWIS, M.D., | |
| Defendants-Appellants, | |
| and | |

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

| BRANT PUTNAM, M.D., an individual; et al.,
|
| Defendants. |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted June 6, 2023
Pasadena, California

Before: WALLACE and OWENS, Circuit Judges, and FITZWATER,[**] District Judge.
Concurrence by Judge FITZWATER.

Defendants Brant Putnam, Janine Vintch, Roger Lewis, and Christian de Virgilio appeal from the district court's two denials of summary judgment on their qualified immunity defense to Timothy Ryan's 42 U.S.C. § 1983 action against them. Ryan claims Defendants violated his First Amendment rights by retaliating against his employment for reporting medical fraud. Because the parties are familiar with the facts, we do not recount them here. We affirm the denial of qualified immunity.

We review summary judgment rulings de novo. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). On interlocutory appeal of the

---

[**] The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

denial of summary judgment on a qualified immunity defense, our jurisdiction is limited to resolving legal questions. *See Plumhoff v. Rickard*, 572 U.S. 765, 771-73 (2014). "Where disputed facts exist, we assume that the version of the material facts asserted by the Plaintiff . . . is correct." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009) (cleaned up).

Defendants are not entitled to qualified immunity if their conduct violated Ryan's First Amendment rights and constituted a violation of clearly established law at the time of the incidents. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Clearly established law exists if precedent placed the unconstitutionality of the conduct "beyond debate." *White v. Pauly*, 580 U.S. 73, 78-79 (2017).

1.      To establish a First Amendment retaliation claim, Ryan must show that his protected speech motivated Defendants to take an adverse employment action against him. *Eng*, 552 F.3d at 1070. Defendants assert that they are entitled to qualified immunity because there is no clearly established law showing that Ryan suffered an adverse employment action. However, we have previously held that a peer review committee's investigation of a doctor that threatened to revoke his clinical privileges was an adverse employment action. *See Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 977 (9th Cir. 2002). Thus, the initiation of the Focused Professional Performance Evaluation ("FPPE") of Ryan was an adverse employment action under clearly established law. The decision to impose a

behavioral contract and revoke clinical privileges in the alternative was also an adverse employment action under clearly established law. The revocation of clinical privileges will necessarily result in termination, a quintessential adverse employment action. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

Defendants argue that these actions are not sufficiently final to constitute adverse employment actions because the FPPE would not necessarily result in discipline and the decision to revoke privileges was subject to appeal. But we have previously held that actions for which the disciplinary outcome is uncertain—such as an investigatory inquiry—are adverse employment actions. *See, e.g.*, *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007).

Defendants also contend that the actions against Ryan are not attributable to them under clearly established law because their only action was voting as members of the Medical Executive Committee. However, we have previously explained in this context that "[a]nyone who 'causes' any citizen to be subjected to a constitutional deprivation is . . . liable," and that the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional

injury." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 n.22 (9th Cir. 2013) (en banc) (citations omitted).

2.    To succeed in his claim, Ryan must also show that he spoke as a private citizen instead of as a public employee. *See Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006).  Defendants contend that they are entitled to qualified immunity because there is no clearly established law showing that Ryan spoke as a private citizen.  "Statements are made in the speaker's capacity as [a private] citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (cleaned up).

Whether Ryan spoke as a private citizen depends on what his employment duties required, which is a factual dispute. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1058-59 (9th Cir. 2013).  Defendants contend that Ryan conceded that his speech was within the scope of his job by asking the county to indemnify him in Rodney White's lawsuit.  However, the speech at issue here is Ryan's external reports of fraud to the District Attorney's office and the National Institutes of Health, which Ryan argues was not part of his job.  Resolving this factual dispute in Ryan's favor, as we must, *Eng*, 552 F.3d at 1067, reporting suspected fraud externally was beyond the scope of his employment as a physician.  And by the

time of the adverse employment actions, it was clearly established that speech by a public employee "not made pursuant to [their] official job duties" is made in their capacity as a private citizen. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1074 (9th Cir. 2012).

3. Even where speech would otherwise be protected, Defendants can defeat Ryan's claim by demonstrating that their "legitimate administrative interests outweigh [Ryan's] First Amendment rights" and the public's interest in Ryan's speech. *Eng*, 552 F.3d at 1071; *see City of San Diego v. Roe*, 543 U.S. 77, 82 (2004). Here, Defendants assert that they are entitled to qualified immunity because there is no clearly established law showing that Ryan's interests outweigh theirs.

We have previously held that the interests of the public employee and the public in whistleblower speech outweigh the employer's interest where the employer shows only the potential for disturbance in the workplace. *See Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009). Here, Defendants have shown *no* interest in suppressing Ryan's whistleblower speech because they do not argue that Ryan's reports of fraud caused disruption or affected patient care. Instead, they argue that their actions were justified by complaints of Ryan's unprofessional behavior largely unrelated to his reports of fraud. But the balancing inquiry does not allow public employers to suppress speech due to the speaker's other conduct.

*See Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 910 (9th Cir. 2021) (noting that the proper inquiry is whether the *speech* in question threatened the employer's interests).

Because Defendants presented no argument that Ryan's whistleblowing itself harmed or would harm their interests, that they lose in the balancing analysis is "beyond debate" and therefore clearly established. *Pauly*, 580 U.S. at 79.

Whether Defendants would have taken the same adverse employment actions regardless of Ryan's whistleblowing is a separate question on which we express no opinion because it is not before us.

**AFFIRMED.**

*Ryan v. Putnam*, 22-55144, 22-55406

FILED

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FITZWATER, District Judge, concurring:

Considering the district court's decision in light of the record before it, and our limited appellate jurisdiction, *see, e.g.*, *Russell v. Lumitap*, 31 F.4th 729, 736 (9th Cir. 2022), I concur in the panel's decision to affirm the denial of qualified immunity for Defendants-Appellants. I write separately to emphasize that our affirmance does not remove qualified immunity from consideration on remand. In the words of another panel of this court, "[t]he result of our affirmance on this interlocutory appeal of the district court's denial of summary judgment motion based upon qualified immunity is to return the qualified immunity issue to the district court for determination on its merits. We express no view on those merits here . . . ." *Thompson v. Mahre*, 110 F.3d 716, 719 n.1 (9th Cir. 1997) (emphasis omitted) (quoting *Thompson v. Mahre and Steen*, 959 F.2d 241 (9th Cir. 1992) (mem.)).

EXHIBIT 5

FOCUSED PROFESSIONAL PRACTICE EVALUATION (FPPE)

This report is generated by the ad hoc Committee that was appointed by Dr. Chris de Virgilio to investigate Dr. Rodney White's request for corrective action against Dr. Tim Ryan. (letter dated 8/25/2015)

The members are:

Dr. Jeanette Derdemezi. Department of Anesthesia
Dr. Adam Jonas, Department of Pediatrics
Dr. Bob Hockberger, Emergency Department
Dr. Ravin Kumar, Department of Surgery
Dr. Bassam Omari, Department of Surgery

Dr. White's request for corrective action has several components.

- Dr. White stated that Dr. Ryan had invaded the personal privacy of his patients thereby violating both HIPAA and CMIA rights of physician-patient privacy.
- Dr. Ryan read Dr. White's personal files, mails, patient operative reports and patient reports without permission to do so.
- Dr. Ryan requested confidential patient information under various CPT codes in order to obtain privileged patient information on Dr. White's patients.
- Dr. Ryan approached various Vascular Division members such as secretaries, OR personnel and ancillary staff to obtain personal information on Dr. White and his patients.
- Dr. Ryan falsely accused Dr. White of plagiarism of research.
- Dr. White stated that Dr. Ryan's unscrupulous conduct had adversely affected his personal and professional life.
- In an addendum request, Dr. White also stated that Dr. Ryan continues to engage in conduct that is detrimental to the delivery of quality of patient care, disruptive and deleterious to operations of the medical center, and below applicable professional standards. Dr. White stated that a continuing pattern of harassment by Dr. Ryan is having a severe adverse impact on his personal and professional life.

The MEC expressed concern that if Dr. White's complaints were validated this could mean that Dr. Ryan's behavior could be viewed as unprofessional. The ad Hoc committee was appointed to investigate the complaints.

PSA BYAWS:

A corrective action can be requested when a practitioner with clinical privileges engage in any act, statement, demeanor, or professional conduct, either within or

outside the Medical Center, which is or is reasonably likely to be detrimental to patient safety or to the delivery of quality of patient care, or to be disruptive or deleterious to the operations of the Medical Center or improper use of medical center resources, or below applicable professional standards.

The ad Hoc committee initially met to determine the approach and plan for this investigation. Following this, the committee met with Dr. White to allow him to present his complaints and provide the names of witnesses that could corroborate his statements.

The Ad Hoc committee met with the following members of Division of Vascular Surgery.

- Dr. Rodney White, (Chief, Vascular Surgery)
- Amanda Flores (OR Scheduler)
- Dr. Chris de Virgilio (Chair, Department of Surgery)
- George Kopchok (Research Director, Vascular Lab)
- Kim Bradley (Nurse Practitioner)
- Dr. Matt Koopmann (Vascular Surgery)
- Dr. Amir El-Sergany (1st Year Vascular Fellow)
- Dr. Carlos Pineda (2nd year Vascular Fellow)
- Rowena Buwalda (Vascular Nurse)
- Dr. Ankur Gupta (Former Vascular Fellow)
- Dr. Carlos Donayre (Vascular Surgery)
- Carla Michell (OR Nurse)
- Mabel Rodriguez (OR Nurse)

The details of these interviews are summarized in a lengthy report which will provided to the MEC along with any evidentiary documents that were provided during the interview process. The following summarizes the Ad Hoc committee's assessment of the facts and possible recommendations.

**Alleged violations of privacy**:

Multiple members of the Vascular Division indicated that they had witnessed Dr. Ryan looking at Dr. White's personal files, mail, and private patient information without authorization. The OR scheduler provided the committee with documents given to her by Dr. Ryan requesting information regarding patients under the care of Dr. White and other physicians. Dr. Ryan was neither authorized to perform quality assurance reviews of the care of these patients nor did he have privileges for research studies involving these patients. Dr. Ryan is not a member of LA Biomed and thus cannot perform research on the Harbor-UCLA campus. Dr. Ryan's efforts to view, collect, or alter medical records of patients under the care of Dr. White appear to be well below applicable professional standards. Because the information accessed by Dr. Ryan is protected patient information and this

was not sanctioned as either quality assurance or research, there is concern that Dr. Ryan's actions in this regard may constitute a violation of HIPAA.

## Collegiality and work environment:

Almost all interviewees described Dr. Ryan's behavior as aggressive and verbally abusive to nurses, fellows and, at times, to patients. They described a hostile work environment where some members felt threatened and did not desire to be part of the vascular work team. Several of those interviewed stated that they feel very intimated and often think about leaving their jobs. Nurses and nurse practitioners who were interviewed felt that they can't continue to work with Dr. Ryan unless he changes his behavior. Dr. Ryan was reported to have a pattern of publicly criticizing the patient management of other members of the team. Multiple interviewees expressed the opinion that they had lost a valuable longstanding member (Dr. Carlos Donayre) of the Vascular Section due to Dr. Ryan's confrontational personality. The impending departure of Dr. Donayre was viewed as very detrimental to the development or even existence of a strong vascular surgery program at Harbor. Dr. Donayre confirmed that he is leaving Harbor due to the behavior of Dr. Ryan. Members of Vascular Surgery who were interviewed liked Dr. White and felt that Dr White always did the best for them personally and professionally. Some stated that Dr. Ryan is trying to destroy Dr. White and his research program. Some members didn't understand why Dr. Ryan failed to join the research program under LA Biomed. Others stated that the difference between Dr. Ryan and Dr. White goes beyond just personal differences between them and may relate to legal action by Dr. Ryan regarding commercial / industry related conflicts.   Evaluation of this latter issue was felt to be beyond the purview of the committee.  There were reports of a shouting argument between cardiologists and Dr. Ryan during the course of a procedure. This report was not verified.

## Education:

Interviewees stated that the impending departure of Dr. Donayre will have a significant adverse impact on the future educational development of the vascular program. Dr. Donayre had stepped down from the Program Director position and handed over responsibility to Dr. Matt Koopmann. Dr. Donayre stated that Dr. Ryan always had been very negative about the Harbor Vascular Residency Program and was not very helpful with the educational activities. The vascular fellows uniformly confirmed that If Dr. White leaves this program, no one will consider Harbor training with any great enthusiasm. Dr. Matt Koopman agreed with such comments.  Several fellows stated that Dr. Ryan had yelled at them, that they felt intimidated, and that it would be hard to recommend Harbor to future fellows due to the environment created by Dr. Ryan. Vascular fellows stated that they don't trust Dr. Ryan and didn't want to ask for any letters of recommendation from him.

**Patient care:**

A number of interviewees felt that while Dr. Ryan is a capable surgeon, his behavior has been detrimental to patient care. Several fellows indicated that Dr. Ryan has yelled at them in front of patients. A number of interviewees noted that the poor communication between Dr. Ryan and the other vascular attending physicians has the potential or already has adversely impacted patient care. Separate operating room suites must now be run so that Dr. Ryan has his own operative area. The impending loss of experienced faculty members in the division may also impair patient care.

**Surgical skills of Dr. White:**

Those interviewed were generally consistent in their appraisal of Dr. White's clinical and technical abilities, regarding him as highly capable surgeon.

**Interaction between Ad Hoc Committee and Dr. Ryan:**

The committee invited Dr. Ryan to speak and to identify people that he wished the committee to interview. He was informed that the Ad Hoc committee was constituted to investigate issues of professional behavior. Dr. Ryan demanded that all questions be provided to him in writing and that he would discuss the situation with his attorney before making a decision. Subsequently Dr. Ryan refused to meet with the committee and sent an email to Drs. Chris de Virgilio and Kumar to confirm his decision. ( e mail is attached)

**Summary:**

The Ad Hoc Committee believes that Dr. Ryan's behavior is well below expected standards for professional conduct. Further, the committee believes that Dr. Ryan's behavior has had serious adverse impacts on the wellbeing of many health care professionals including attending physicians, physician trainees, nurses and other ancillary staff. His unauthorized access of the files of patients enrolled in studies or under the care of other physicians may constitute a violation of HIPAA. Finally, it appears that despite Dr. Ryan's acknowledged technical expertise, he is adversely impacting patient care through his behavior. The MEC is advised that the Ad Hoc committee believes that disciplinary action is justified to safe guard Harbor employees, trainees, and patients.

We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's

ER v 8

1542

**EXHIBIT 5** 214-0040011

unprofessional behavior. Dismissal from the medical staff or discontinuation of medical privileges are options that can considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism. At a minimum, we believe that Dr. Ryan should receive professional counseling regarding his behavior, that behavioral limits should be set, and that ongoing monitoring of his interactions with others should take place until the problem is believed to be resolved. The Department Chair, residency/ fellowship program directors and nursing directors are suggested as the monitoring team for such action. This report reflects a unanimous consensus among committee members.



PROFESSIONAL STAFF ASSOCIATION
LOS ANGELES COUNTY / HARBOR-UCLA MEDICAL CENTER
MEDICAL STAFF SERVICES
1000 West Carson Street, Box 2; Torrance, CA 90509-2910
(310) 222-2171; Fax (310) 222-5601

November 10, 2016

***Confidential Medical Staff Peer Review Document***
***Protected from Discovery by Evidence Code Section 1157***

Timothy Ryan, M.D.
417 W. 39th Street
San Pedro, CA 90731
tjryanmd@gmail.com

RE:   **Notice of Charges**

Dear Dr. Ryan:

Pursuant to the Professional Staff Association (the "PSA") Medical Staff Bylaws ("Bylaws")
Section 7.4-3, the following Notice of Charges responds to your request for a hearing on the
proposed action of the PSA Medical Executive Committee ("MEC"), to revoke your
Professional Staff membership and privileges at Harbor-UCLA Medical Center (the
"Proposed Action").

A Notice of Hearing will be sent to you once the parties engage the Hearing Officer and have
set dates for the start of the hearing. The hearing will be conducted according to the
hearing procedure set forth in Bylaws Article VII, a copy of which you have previously
received.

### PROCEDURAL MATTERS

### Representation

Pursuant to Bylaws Section 7.5-4, you are entitled to be represented by an attorney or
other person of your choice. We understand that you will be represented at the hearing by
David Rosenberg, Esq. of Rosenberg, Shpall & Zeigen. The MEC will be represented by:

Erin L. Muellenberg
Annie Chang Lee
Arent Fox LLP
555 West Fifth Street, 48 Floor
Los Angeles, California  90013
Phone: (213) 443-7516
Fax: (213) 629-7401
erin.muellenberg@arentfox.com

**Exhibit 381**

**ER v 8**

43                1817

DEF007489

## Personal Presence Mandatory

As required by Bylaws Section 7.4-5, your personal presence at the hearing is mandatory. Failure, without a showing of good cause, to appear and proceed at the hearing shall be deemed to constitute voluntary acceptance of the recommendations or actions involved which shall become final and effectively immediately.

## Potential Witnesses

The MEC expects to call on the following individuals to testify in this matter:

- Rodney White, M.D.
- Ravin Kumar, M.D.
- Robert Hockberger, M.D.
- Clint Coil, M.D.
- Christian DeVirgilio, M.D.
- Ira Lesser, M.D.
- Rowena Buwalda, RN
- Carla Mitchell RN
- Kim Bradley NP

The MEC reserves the right to amend the witness list at any time, with proper advance notice and to add and call other witnesses to testify at the hearing.  In accordance with the Bylaws, the MEC requests that you provide a list of witnesses you intend to call during the hearing.

## Exhibits

Pursuant to Bylaws Section 7.5-1, the MEC will provide to your counsel all documents and other evidence it intends to introduce at the hearing.  In the event additional documents are identified, the MEC will produce them at least thirty (30) days prior to the commencement of the evidentiary hearing sessions.  You are requested to provide, at least thirty (30) days prior to the commencement of the hearing, any and all documents or other evidence you intend to introduce at the hearing.   The MEC will provide copies of all exhibits it intends to use to the Hearing Officer and the Judicial Review Committee and requests that you do the same.

## NOTICE OF CHARGES

Timothy Ryan, M.D. ("Dr. Ryan") is a member of the Harbor-UCLA Medical Center Medical Staff,  in the Division of Vascular Surgery.  His unprofessional and uncooperative conduct and interactions with other Medical Staff members and support staff, have compelled the MEC to recommend revoking his Medical Staff membership and privileges. Dr. Ryan's conduct and interactions weaken the health care team's performance and thus either have

DEF007490

a negative impact on patient care or create an unacceptable potential for such impact. Dr.
Ryan has shown himself to be unfit to be a Medical Staff member.

The MEC voted to revoke Dr. Ryan's PSA membership and privileges at Harbor-UCLA
Medical Center based on his unprofessional and uncooperative conduct. The MEC contends
that the MEC's Proposed Action is reasonable, warranted and necessary to avoid patient
harm and to promote high-quality patient care at Harbor-UCLA Medical Center.

### Background

Harbor-UCLA Medical Center is one of only five level one trauma centers in Los Angeles
County, and it is a major academic teaching hospital with nearly 450 residents and fellows.
Harbor-UCLA Medical Center offers a well-respected two (2) year Vascular Fellowship for
residents who have competed a General Surgery Residency training program. Dr. Ryan was
recruited and joined the Division of Vascular Surgery in 2013. An essential component of
any teaching program and a fundamental requirement for Medical Staff membership is the
ability to work professionally and "cooperatively so as not to adversely affect patient care."
(Bylaws, Section2.4-7). Unfortunately, Dr. Ryan has proven that he is unable to meet this
basic requirement.

Among the Medical Staff members and support staff, Dr. Ryan has a reputation of
displaying unprofessional conduct. After receiving multiple credible complaints, the MEC
initiated an ad hoc investigative committee. The ad hoc committee was charged to
investigate the allegations that Dr. Ryan's unprofessional and disruptive conduct was:

> (1) detrimental to the staff's ability to deliver quality patient care;
> (2) disruptive and deleterious to operations of Harbor-UCLA Medical Center.

The ad hoc committee reviewed documents, interviewed various members of the Vascular
Surgery team, and offered to meet with Dr. Ryan. In a report dated February 26, 2016, the
ad hoc committee summarized its *unanimous* findings that Dr. Ryan's behavior has a
negative impact on patient care. The ad hoc committee found that such behavior is well
below expected standards for professional conduct and a violation of the PSA Bylaws.
Specific identified inappropriate behaviors included but are not limited to the following:

- Openly and loudly criticizing other PSA members in front of multiple Medical Center
  and PSA staff in a disruptive manner;
- Openly threatening to call external agencies to conduct investigations;
- Openly making unfounded accusations in an angry manner;
- Openly making belittling and berating statements;
- Openly making degrading and demeaning statements;
- Refusing to answer questions regarding patient care;
- Openly and angrily telling Medical Center staff to do what he says without offering
  any explanation;
- Refusing to acknowledge other patient care team members;

**ER v 8**                                                                    **1819**

DEF007491

- Approaching and addressing staff in an angry and intimidating manner; and
- Failure to work cooperatively and professionally together as a member of the patient care team.

The ad hoc committee found the witnesses to be consistent and credible, and after considering all available information, determined that a recommendation for disciplinary action was reasonable, necessary and warranted to safeguard Harbor-UCLA Medical Center's employees, trainees, and patients. At a minimum, the ad hoc committee recommended that Dr. Ryan undergo professional behavioral counseling, that behavioral limits be set, and that ongoing monitoring of his interactions with others take place until his behavioral problems are resolved. The ad hoc committee also recommended that the MEC consider dismissing Dr. Ryan from the Medical Staff.

Prior to acting on the ad hoc committee's report, the MEC held a meeting where Dr. Ryan was invited to attend and present his response to the behavior concerns. Dr. Ryan was accompanied to the meeting by his attorney. After the MEC carefully considered the ad hoc committee's findings, the MEC rejected the revocation of Dr. Ryan's Medical Staff membership and privileges as the first step. Instead, the MEC voted to provide Dr. Ryan the opportunity of remediation by entering into a behavioral contract, and only if Dr. Ryan refused to enter into a behavioral contract, then recommend revocation of his Medical Staff membership and privileges. The terms of the behavioral contract were reasonable and included provisions requiring him to abide by the PSA Bylaws, to refrain from inappropriate behavior at Harbor-UCLA Medical Center, to participate in UCSD's Physician Assessment and Clinical Education Anger Management program, and to consult the Well-Being Committee.

Dr. Ryan, however, repeatedly refused to meet with Brant Putnam, M.D., President of the PSA, to discuss the proposed behavioral contract. On September 6, 2016, Dr. Putnam had no choice but to e-mail Dr. Ryan the proposed behavioral contract and gave him until September 30, 2016, to sign the contract. Dr. Ryan did not sign and return the behavioral contract by the September 30, 2016, deadline or any time since that date nor has he indicated a willingness to negotiate the contract.

## Charges

The MEC's Proposed Action as set forth above is based on the following charges:

### Charge Number 1

Bylaws, Section 2.1-1 states in pertinent part:

> Membership in the Association is a privilege which shall be extended only to professionally competent and licensed…practitioners who continuously meet the qualifications, standards and requirements set forth in these bylaws.

DEF007492

By virtue of his unprofessional and disruptive conduct, Dr. Ryan has failed to *continuously* meet the qualifications, standards and requirements set forth in the Bylaws.

## Charge Number 2

Bylaws, Section 2.2 provides for the basic qualifications for PSA membership and privileges.  Section 2.2-2.2 further provides that only individuals who

> are determined to adhere to the ethics of their profession, to maintain good reputation, to be able to work cooperatively with others so as not to adversely affect patient care, and to keep as confidential as required by law, all information or records received in the physician-patient relationship are qualified for PSA membership.

Based on his unprofessional and disruptive conduct Dr. Ryan fails to meet the qualifications for PSA membership.

## Charge Number 3

Bylaws, Section 2.4 sets forth the basic responsibilities of PSA membership.   Specifically, set forth is Section 2.4-7, which states:

> Working cooperatively with others so as not to adversely affect patient care.

Dr. Ryan has violated the PSA Bylaws by failing to work cooperatively with others which has directly and adversely affected patient care.

## Charge Number 4

Bylaws, Section 2.4, sets forth the basic responsibilities of PSA membership and specifically includes under Section 2.4-2 the following:

> Abiding by the Association bylaws, rules and regulations, and policies and departmental rules and regulations, Medical Center policies and procedures, and Department of Health Services applicable policies and procedures approved by the Executive Committee.

Dr. Ryan has violated the Bylaws by his unprofessional and disruptive behavior.

DEF007493

**Charge Number 5**

Bylaws, Section 5, sets forth the requirements for professional conduct. These requirements are a *condition of* membership and privileges. Disruptive and inappropriate conduct is specifically defined in Section 5. Included in Section 2.5-2.3 is:

> Deliberate, physical, visual or verbal intimidation or challenge, including disseminating threats or pushing, grabbing or striking another person involved in the Medical Center.

Dr. Ryan has violated the professional conduct requirements of the Bylaws by unprofessional and disruptive conduct.

**Charge Number 6**

Bylaws, Section 5, sets forth the requirements for professional conduct. Section 2.5-2.4 sets forth the following specific acts as inappropriate conduct which can reasonably be interpreted as demeaning or offensive and when persistent becomes a form of harassment.

a. belittling or berating statements;
b. name calling;
c. use of profanity or disrespectful language;
d. writing inappropriate comments in the medical record;
e. blatant failure to respond to patient care needs or staff requests;
f. deliberate refusal to return phone calls, pages or other messages concerning patient care or safety;
g. deliberate lack of cooperation without good cause; and
h. making degrading or demeaning comments about patients and their families, nurses, physicians, Medical Center personnel and/or the Medical Center.

Dr. Ryan has violated the bylaws and conduct requirements by his unprofessional and disruptive conduct.

**Charge Number 7**

Bylaws, Section 2.5 sets forth the professional conduct requirements and specifically includes under Section 2.5-2.6 the following:

> Refusal or failure to comply with these member conduct requirements.

Dr. Ryan has specifically violated the Bylaws by his "refusal or failure to comply with [the PSA's] member conduct requirements."

*****

ER v 8                                                                                    **1822**

48

DEF007494

The MEC reserves the right to amend this Notice of Charges at any time before the matter is submitted for decision by the JRC. In that event the MEC will stipulate to allowing Dr. Ryan the time required by Bylaws Article VII to defend against any new or revised charges.

Respectfully submitted,

Brant Putnam, M.D.
President
Professional Staff Association

DEF007495